Sherry C. FAULKNER *v.*
ARKANSAS CHILDREN'S HOSPITAL;
Bonnie Taylor, M.D.; Michelle Moss, M.D.;
Lorrie Baker, R.N.; and
Carl Chipman, R.N., C.C.P.

01-860 69 S.W.3d 393

Supreme Court of Arkansas
Opinion delivered March 14, 2002
[Petition for rehearing denied April 11, 2002.]

*Mark Alan Peoples, PLC,* for appellant.

*Friday, Eldredge & Clark*, by: *Elizabeth R. Murray, Michael S. Moore*, and *Daniel L. Herrington*, for appellees.

ROBERT L. BROWN, Justice. Appellant Sherry C. Faulkner appeals from an order granting the motion to dismiss filed by appellees Arkansas Children's Hospital (ACH) and four medical professionals who worked at ACH: Dr. Bonnie Taylor, Dr. Michelle Moss, registered nurse Lorrie Baker, and registered nurse Carl Chipman. We hold that the circuit court did not err in granting the Rule 12(b)(6) motion, and we affirm.

The facts are taken from the allegations in Faulkner's complaint. Because we are reviewing an order granting a motion to dismiss under Ark. R. Civ. P. 12(b)(6), we accept the facts alleged as true. *King v. Whitfield*, 339 Ark. 176, 5 S.W.3d 21 (1999). Faulkner was employed at ACH as the Extra Corporeal Membrane Oxygenation (ECMO) Technical and Educational Coordinator in 1989. ECMO is a medical process which provides support to patients with respiratory or cardiopulmonary failure. ECMO is used when patients are not benefitted by other supportive therapies such as conventional ventilation.

Faulkner held the position of ECMO Coordinator from June 1, 1989, to February 10, 1999. When she was first hired to open ACH's ECMO facilities in 1989, she purchased the necessary equipment and otherwise prepared ACH for the beginning of its ECMO program. Faulkner selected the program's original staff, including nurse Lorrie Baker, whom she selected to fill the position of ECMO nurse Coordinator. Faulkner also established a mobile ECMO unit. While in the position of ECMO Coordinator, Faulkner was a member of and an active participant in several national ECMO organizations. In her capacity as a cardiovascular perfusionist, she won the 1999 Perfusionist of the Year award from the American Society of Cardiovascular Perfusion. Faulkner is also the author of scientific articles concerning ECMO.

In the summer of 1990, after the ECMO program had been in operation for roughly a year, ACH hired Dr. Mark Heulitt to be the pediatric ECMO physician. Heulitt represented that his experience with ECMO was extensive. Faulkner, however, reported to her superiors that when Heulitt worked on his first ECMO patient in October 1990, he "did not know what he was doing" and was "totally lost." Additionally, Heulitt's former employer provided information that contrary to Heulitt's representations, his experience with neonatal ECMO was limited. Faulkner's superiors took no action following her report.

Heulitt later wrote a letter to one of Faulkner's superiors, ECMO Medical Director Dr. Jim Fasules, describing Faulkner as "emotionally unstable." The letter was written in response to a meeting between Faulkner and Heulitt that was called to discuss an incident in which a patient became endangered during a mobile ECMO procedure. While discussing the issue, "Faulkner was not allowed to carry out the orders of . . . Dr. Fasules." Faulkner wrote a memo to Fasules describing the meeting, and Fasules wrote a letter in response in which he too described Faulkner as emotionally unstable.

In December of 1991, Dr. Taylor and nurse Baker began conspiring together to usurp Faulkner's authority and responsibilities as ECMO coordinator. They circumvented communications with her and changed her call schedule and the standard of care for patients without consulting her. They also made personnel decisions without her consent.

In December of 1997, a patient was flown from Louisiana to ACH and was placed on the mobile ECMO. The patient was administered a larger quantity of drugs than should have been administered. The cause of the mistake was nurse Chipman's and nurse Baker's use of untested equipment and lack of attention to detail in the loading and securing of the ECMO equipment. Dr. Moss was the responsible physician, but she blamed Faulkner for the incident. Since that time she has been short and abrupt with Faulkner and has wrongly accused her of improper conduct.

In the fall of 1998, Dr. Moss made a decision to place a patient on ECMO. Faulkner was not consulted even though she was the ECMO coordinator on call that day. Nurse Baker did not report the patient's status to Faulkner. When Faulkner arrived on the scene, she noticed that the drug delivery apparatus was not properly arranged and that as a result, the patient was not being administered the necessary drugs. The patient had low blood pressure because of this mistake. Faulkner corrected the mistake and remained with the patient. The next day, Dr. Moss blamed Faulkner for changes in the patient's EKG in front of other ACH employees. She accused Faulkner of being "sloppy and/or incompetent," even though she knew that the accusation was not true.

At about this time, Faulkner requested an internal audit of the ECMO unit to identify areas needing improvement in patient care. She identified other ECMO staff members' mistakes to her superiors and reported that Dr. Taylor was not communicating properly with her. Faulkner also maintained that nurse Baker deliberately

concealed staff meetings from her to keep her from attending. Nurse Baker further deliberately gave false information to other ECMO centers regarding Faulkner and her duties. Additionally, Faulkner advised her superiors that nurse Baker did not follow protocols regarding ECMO patients during this time period. Despite Faulkner's revelation of specific patients and documented breaches in their care and paperwork, ACH took no disciplinary action towards nurse Baker.

In February 1999, ACH alleged that Faulkner mishandled three patients. The incidents occurred on February 5, 9, and 10 of that year. Two of the incidents resulted in blood or fluid spillage. Faulkner specifically disputed the mishandling allegations and maintained that she did the best job she could under the circumstances. She reviewed her actions with the attending physician in each incident. Her actions did not place patients in jeopardy. Also in February of that year, nurse Chipman told Dr. Taylor that Faulkner had made many mistakes when performing ECMO. He said that Faulkner "had been good for about 2 years but then had dropped off in her productivity." Nurse Chipman knew that his statement was untrue.

On February 12, 1999, Faulkner was called to a meeting with Dr. Taylor and registered nurse Mary McDaniel, a vice-president of ACH. At that time, Faulkner was asked to give a statement regarding one of the three patients whom Faulkner allegedly mishandled earlier that month. At the meeting, Dr. Taylor and nurse McDaniel had a copy of Faulkner's medical insurance program and ACH benefits plan. They had marked sections covering psychiatric conditions. Nurse McDaniel asked Faulkner to leave the hospital and not return until she was contacted to do so. Nurse McDaniel further cautioned Faulkner not to do any work from home that concerned ECMO. ACH placed Faulkner on an emergency administrative leave of absence, vaguely citing Faulkner's state of mind as the reason for the leave.

ACH and Dr. Taylor later insisted that Faulkner obtain a psychological evaluation for "extreme paranoia, stress, and possible psychomotor disorder." Dr. Taylor stated that she thought Faulkner was "stressed out" and cited the February 10, 1999 incident in which Dr. Taylor asserted that Faulkner dumped pressurized blood on the floor. No formal documentation of the reasons for the administrative leave was presented to Faulkner. Faulkner was not given notice of the cause for her suspension or reassignment, and she was not given a hearing or other similar opportunity to respond to the alleged deficiencies.

On February 18, 1999, Faulkner received a psychological examination from Dr. Cheralyn Powers. Dr. Powers's conclusions were that Faulkner suffered a paranoid reaction to being placed on leave. Dr. Powers could not conclude that any paranoia was present before the administrative action was taken by ACH, and she recommended that Faulkner return to her job. Dr. Powers's report was not issued until March 1, 1999.

In a letter dated March 17, 1999, ACH accused Faulkner of several improper acts and errors in her handling of ECMO patients during the month of February 1999. Faulkner was not given a chance to respond, despite the fact that "[t]he events described in the ACH letter [were] incorrect or grossly misinterpreted and mischaracterized."

ACH told Faulkner that the circumstances surrounding her leave would not be made public and would be disseminated only on a need-to-know basis. However, while on leave, Faulkner received a telephone call from a person who did not work at ACH and did not live in Little Rock. The person knew the circumstances surrounding her administrative leave. Faulkner believes that it was nurse Baker and Dr. Taylor who were responsible for any unauthorized disclosure of Faulkner's situation. Additionally, nurse Chipman and others knew of Faulkner's being placed on leave before she did and openly discussed it with staff members.

ACH did not follow its own internal procedures in placing Faulkner on administrative leave. ACH may place an individual on leave for three days to investigate alleged incidents, but Faulkner was placed on leave for approximately five weeks. Additionally, when Faulkner initiated a grievance procedure, as allowed by ACH procedures, ACH again did not follow its own procedures because it omitted steps in the grievance process. Specifically, ACH did not issue a written report on the grievance following investigation, as mandated by its procedures. ACH also prematurely terminated Faulkner's complaint process.

Faulkner was not allowed to return to work until April 1, 1999. She was returned to the position of cardiovascular perfusionist and was not allowed to return to her previous position of ECMO coordinator. ACH's position was that Faulkner could not handle the stress of the coordinator position. Faulkner contends that the position of perfusionist subjects her to much greater stress than did the coordinator position.

In the fall of 1999, nurse Chipman unilaterally contacted the ECMO coordinator at the University of Michigan. Nurse Chipman falsely told the ECMO coordinator there that Faulkner could have nothing to do with ECMO at ACH and was no longer allowed to write or present on the subject.

On August 22, 2000, Faulkner filed her complaint in Pulaski County Circuit Court against the appellees. Faulkner stated in her complaint that she filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission in 1999 and a subsequent complaint in federal district court in 2000, but on her motion, the federal complaint was dismissed without prejudice. She asserted in her state complaint six causes of action: violation of the Arkansas Civil Rights Act, defamation, outrage, interference with contractual relations, breach of contract, and civil conspiracy. She prayed for compensatory and punitive damages as well as for reinstatement to her former position as ECMO coordinator. On September 6, 2000, the appellees filed a motion to dismiss under Ark. R. Civ. P. 12(b)(6). Following a hearing for arguments of counsel, the circuit court granted the motion.

## I. Standard of Review

■■ Faulkner initially raises the issue of the standard this court should employ in its review of the trial court's order of dismissal. As already noted, this court reviews a trial court's decision on a motion to dismiss by treating the facts alleged in the complaint as true and by viewing them in the light most favorable to the plaintiff. *King v. Whitfield, supra; Neal v. Wilson*, 316 Ark. 588, 873 S.W.2d 552 (1994). In viewing the facts in the light most favorable to the plaintiff, the facts should be liberally construed in plaintiff's favor. *Rothbaum v. Arkansas Local Police & Fire Retirement Sys.*, 346 Ark. 171, 55 S.W.3d 760 (2001); *Martin v. Equitable Life Assurance Soc. of the U.S.*, 344 Ark. 177, 40 S.W.3d 733 (2001). Our rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief. Ark. R. Civ. P. 8(a)(1); *Grine v. Board of Trustees*, 338 Ark. 791, 2 S.W.3d 54 (1999); *Brown v. Tucker*, 330 Ark. 435, 954 S.W.2d 262 (1997).

Faulkner asserts that the trial court failed to accept the facts alleged in her complaint as true. We will address this point with respect to each point of appeal.

## II. The Arkansas Civil Rights Act

Faulkner's first point relating to a dismissed cause of action is that the trial court erred in dismissing her Arkansas Civil Rights Act claim. She asserts that though she is not disabled, she was regarded by her superiors at ACH as being disabled. The appellees respond that the Arkansas Civil Rights Act, unlike the federal Americans with Disabilities Act, does not contemplate a cause of action for those merely "regarded as" being disabled. The trial court, nevertheless, concluded that the Arkansas Civil Rights Act does contemplate a cause of action for a person regarded as having a disability. The trial court found, however, that Faulkner had not pled facts sufficient to show that she was regarded as having a disability within the meaning of the Act.

This issue presents the court with a matter of statutory interpretation. We review issues of statutory interpretation *de novo*, as it is for this court to decide what a statute means. *Fewell v. Pickens*, 346 Ark. 246, 57 S.W.3d 144 (2001); *Hodges v. Huckabee*, 338 Ark. 454, 995 S.W.2d 341 (1999). In this respect, we are not bound by the trial court's decision; however, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. *Harris v. City of Little Rock*, 344 Ark. 95, 40 S.W.3d 214 (2001); *Norman v. Norman*, 342 Ark. 493, 30 S.W.3d 83 (2000). The first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Raley v. Wagner*, 346 Ark. 234, 57 S.W.3d 683 (2001); *Dunklin v. Ramsay*, 328 Ark. 263, 944 S.W.2d 76 (1997). When the language of a statute is plain and unambiguous, there is no need to resort to rules of statutory construction. *Stephens v. Arkansas Sch. for the Blind*, 341 Ark. 939, 20 S.W.3d 397 (2000); *Burcham v. City of Van Buren*, 330 Ark. 451, 954 S.W.2d 266 (1997). Where the meaning is not clear, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, the legislative history, and other appropriate means that shed light on the subject. *Stephens v. Arkansas Sch. for the Blind, supra* (citing *State v. McLeod*, 318 Ark. 781, 888 S.W.2d 639 (1994)). Finally, the ultimate rule of statutory construction is to give effect to the intent of the General Assembly. *Ford v. Keith*, 338 Ark. 487, 996 S.W.2d 20 (1999); *Kildow v. Baldwin Piano & Organ*, 333 Ark. 335, 969 S.W.2d 190 (1998).

The Arkansas Civil Rights Act of 1993 is codified at Ark. Code Ann. §§ 16-123-101 to -108 (Supp. 2001). Disability is defined as follows under that Act:

> (3) "Disability" means *a physical or mental impairment that substantially limits a major life function*, but "disability" does not include:
>
>> (A) Compulsive gambling, kleptomania, or pyromania;
>>
>> (B) Current use of illegal drugs or psychoactive substance use disorders resulting from illegal use of drugs; or
>>
>> (C) Alcoholism;

Ark. Code Ann. § 16-123-102(3) (Supp. 2001) (emphasis added). A second relevant portion of the Act provides:

> (a) The right of an otherwise qualified person to be free from discrimination because of race, religion, national origin, gender, or *the presence of any sensory, mental, or physical disability* is recognized as and declared to be a civil right. This right shall include, but not be limited to:
>
>> (1) The right to obtain and hold employment without discrimination[.]

Ark. Code Ann. § 16-123-107(a)(1) (Supp. 2001) (emphasis added).

As the emphasized portions of these statutes illustrate, there is no express provision for a cause of action for one who is simply "regarded as" having a disability by others. In this respect, the Arkansas Civil Rights Act differs materially from the federal Americans with Disabilities Act. The federal legislation provides this definition of "disability:"

The term "disability" means, with respect to an individual:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) *being regarded as* having such an impairment.

42 U.S.C. § 12102(2) (1998) (emphasis added).

The plain language of these two legislative enactments differs significantly. It is true, as Faulkner points out, that the Arkansas Civil Rights Act specifically provides that our state courts may look to state and federal decisions which interpret the federal civil rights laws as persuasive authority for interpretive guidance. The relevant section provides:

> When construing this section, a court may look for guidance *to state and federal decisions* interpreting the federal *Civil Rights Act of 1871*, as amended and codified in 42 U.S.C. § 1983, as in effect on January 1, 1993, which decisions and act shall have persuasive authority only.

Ark. Code Ann. § 16-123-105(c) (Supp. 2001). The Arkansas statute, however, does not similarly point to decisions reached interpreting the Americans with Disabilities Act.

The Eighth Circuit Court of Appeals recently offered its view that our court would interpret the Arkansas Civil Rights Act's definition of "disability" in identical fashion to its federal corollary. *See Land v. Baptist Med. Center,* 164 F.3d 423 (8th Cir. 1999). In *Land,* the court stated:

> Additionally, Land contends the district court committed error in deciding Megan was not disabled within the meaning of the ACRA. The Arkansas Supreme Court has not yet decided whether a food allergy is a disability under the ACRA, and so we "must decide 'what the [Arkansas Supreme Court] would probably hold were it called upon to decide the issue.' " *Lenhardt v. Basic Inst. of Tech., Inc.,* 55 F.3d 377, 379 (8th Cir. 1995) (quoting *Hazen v. Pasley,* 768 F.2d 226, 228 (8th Cir. 1985)). The definition of disability in both the ACRA and the ADA are in all relevant respects the same, *compare* Ark. Code Ann. § 16-123-102(3) *with* 42 U.S.C. § 12102(2)(A), and we believe the Arkansas Supreme Court would consider analogous federal ADA decisions in deciding the issue confronting us in this case, *Lenhardt,* 55 F.3d at 380.

*Land,* 164 F.3d at 425-26. The Eighth Circuit Court's decision, of course, is not binding authority for this court. But, in addition, the definition of a *presently occurring* disability, which was at issue in *Land,* is virtually the same in both acts: substantial limitation in a major life activity. Hence, the situation in *Land* is dramatically different from what confronts us in the case at hand. Here, we are called upon to read a section of the federal act into the Arkansas act. Specifically, Faulkner asks this court to extend the plain language of

the Arkansas Civil Rights Act's definition of disability to include coverage for persons *regarded as* having a disability.

■■ We decline to expand the statutory definition of disability in this manner as it would be akin to legislating. *See, e.g., Shoemaker v. State*, 343 Ark. 727, 38 S.W.3d 350 (2001) (refusing to judicially legislate a fighting-words exception into an otherwise constitutionally infirm statute); *Four County (NW) Regional Sold Waste Mgmt. Dist. Bd. v. Sunray Serv., Inc.*, 334 Ark. 118, 971 S.W.2d 255 (1998) (rejecting *de novo* review of legislative action as judicial legislation violative of the separation-of-powers doctrine). The plain language of the Arkansas Civil Rights Act makes clear that our state act only contemplates coverage for persons presently suffering a disability. In this case, Faulkner does not allege that she has a present disability. Quite to the contrary, she adamantly denies in her complaint that she has any sort of mental impairment. As such, she has not stated facts sufficient to allege a cause of action for discrimination under the Arkansas Civil Rights Act. The trial court's decision to dismiss the claim should be affirmed as the right result, though that result was reached for the wrong reason. *Madden v. Aldrich*, 346 Ark. 405, 58 S.W.3d 342 (2001); *Ouachita Trek & Dev. Co. v. Rowe*, 341 Ark. 456, 17 S.W.3d 491 (2000); *Malone v. Malone*, 338 Ark. 20, 991 S.W.2d 546 (1999).

## III. Defamation

Faulkner next contends that the trial court erred in dismissing her cause of action for defamation. The trial court correctly disposed of most of the instances of alleged defamation by noting that they were time-barred under the one-year statute of limitations set out in Ark. Code Ann. § 16-56-104(4) (1987). Faulkner concedes this point. However, she maintains that one incident, namely nurse Chipman's statement to the University of Michigan ECMO coordinator in the fall of 1999, was actionable as slander and should not have been dismissed.

■■ A viable action for defamation turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation. *Dodson v. Allstate Ins. Co.*, 345 Ark. 430, 47 S.W.3d 866 (2001); *Southall v. Little Rock Newspapers, Inc.*, 332 Ark. 123, 964 S.W.2d 187 (1998); *Thomson Newspaper Publishing Inc. v. Coody*, 320 Ark. 455, 896 S.W.2d 897 (1995). The following elements must be proved to support a claim of defamation, whether it be by the spoken word (slander) or the written word (libel): (1) the defamatory nature of the statement of fact; (2)

that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages. *Dodson v. Allstate Ins. Co., supra; Brown v. Tucker,* 330 Ark. 435, 954 S.W.2d 262 (1997); *Minor v. Failla,* 329 Ark. 274, 946 S.W.2d 954 (1997) (citing *Mitchell v. Globe Int'l Pub., Inc.,* 773 F. Supp. 1235 (W.D. Ark. 1991)).

 The allegedly defamatory statement must also imply an assertion of an objective verifiable fact. *Dodson v. Allstate Ins. Co., supra; Dodson v. Dicker,* 306 Ark. 108, 812 S.W.2d 97 (1991) (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1 (1990)). In order to determine whether a statement may be viewed as implying an assertion of fact, the following factors must be weighed: (1) whether the author used figurative or hyperbolic language that would negate the impression that he or she was seriously asserting or implying a fact; (2) whether the general tenor of the publication negates this impression; and (3) whether the published assertion is susceptible of being proved true or false. *Dodson v. Allstate Ins. Co., supra; Dodson v. Dicker, supra.*

We turn then to the pertinent allegations in Faulkner's complaint:

> Sometime in the fall of 1999, Defendant Chipman telephoned Ms. Robin Chapman, ECMO coordinator at the University of Michigan. Without legitimate purpose or reason, Chipman told Chapman that Faulkner was no longer ECMO coordinator at ACH. Chipman falsely told Chapman that Faulkner would be forced to leave the ECLS steering committee and that Faulkner could have nothing to do with ECMO and would no longer be allowed to present or write regarding ECMO. Chipman's statements to Chapman regarding Faulkner were not true. Chipman knew, at the time he made such statements, that they were untrue. Chipman made such statements with the intent to harm Faulkner in her profession.

Faulkner made three allegations in this paragraph of her complaint. The first, that Faulkner was no longer ECMO coordinator at ACH, was a true statement and thus cannot be defamatory. The second and third statements, that Faulkner "would be forced to leave the ECLS steering committee," and that she "could have nothing to do with the ECMO and would no longer be allowed to present or write regarding ECMO," could be read, as the trial court pointed out, as a prediction of what Chipman thought might happen in the future. Yet, we are mindful of the fact that it could also be read as what nurse Chipman considered Faulkner's current status to be

with respect to the ECLS steering committee and her ability to publicly comment on her ECMO work.

■ Given our standard of liberal construction of a plaintiff's complaint in favor of the plaintiff when considering a Rule 12(b)(6) motion to dismiss, we are reluctant to dismiss this cause of action on the basis of one interpretation of what was said. Nevertheless, we again hold that the trial court reached the right result, albeit for the wrong reason, because Faulkner has not pled specific facts demonstrating that she has suffered actual damage to her reputation, but has only pled a conclusion to that effect. That is not enough to withstand a Rule 12(b)(6) motion. *See* Ark. R. Civ. P. 8(a)(1); *Grine v. Board of Trustees, supra.* Actual damage, of course, is an element of defamation, *see Dodson v. Allstate Ins. Co., supra,* and Arkansas no longer recognizes the doctrine of defamation *per se* which, under the common law, presumed damage to reputation. *See United Ins. Co. of America v. Murphy,* 331 Ark. 364, 961 S.W.2d 752 (1998); *Dodson v. Allstate Ins. Co., supra.* Because of her failure to plead facts supporting actual damage to her reputation, her defamation claim was properly dismissed.

## IV. Outrage

■■ For her next point, Faulkner urges that the trial court erred in dismissing her cause of action for the tort of outrage. There are four elements that are necessary to establish liability for the tort of outrage: (1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community;" (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. *Crockett v. Essex,* 341 Ark. 558, 19 S.W.3d 585 (2000); *Deitsch v. Tillery,* 309 Ark. 401, 833 S.W.2d 760 (1992). In sum, this court has taken a very narrow view of claims of outrage. *See, e.g., Croom v. Younts,* 323 Ark. 95, 913 S.W.2d 283 (1996); *Ross v. Patterson,* 307 Ark. 68, 817 S.W.2d 418 (1991). This court has recognized a cause of action for the tort of outrage in an employment setting. *See, e.g., Palmer v. Arkansas Council on Econ. Educ.,* 344 Ark. 461, 40 S.W.3d 784 (2001); *M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980).

■■ The question before us today is whether, as a matter of law, the conduct of the appellees can reasonably be regarded as so outrageous as to permit recovery. *Palmer v. Arkansas Council on Econ. Educ., supra; Deitsch v. Tillery, supra.* Merely describing conduct as outrageous does not make it so. *Crockett v. Essex, supra; Fuqua v. Flowers,* 341 Ark. 901, 20 S.W.3d 388 (2000). Faulkner argues to this court that "if allowed to proceed, she can establish that the conduct [of the appellees] meets [the] high standard" required for claims of outrage. However, we must look only to the facts as alleged in her complaint. Under our standard of review, we will give those facts a liberal interpretation, but we cannot surmise what additional facts might be developed should this claim be allowed to proceed. Arkansas is a fact-pleading state. Ark. R. Civ. P. 8(a)(1). As such, a plaintiff must state facts in the complaint sufficient, if taken as true, to sustain her causes of action.

Two cases where the tort of outrage was alleged and which arose out of the workplace appear pertinent. In *Smith v. American Greetings Corp.,* 304 Ark. 596, 804 S.W.2d 683 (1991), the plaintiff alleged that he had a dispute with his shift leader while at work, and after work, he tried to discuss the matter, but the shift leader hit him. He alleged that he was fired the next day because management asserted that he had provoked his shift leader into a fight. In that case, we affirmed dismissal of the outrage claim under Ark. R. Civ. P. 12(b)(6), even though the plaintiff's boss had actually been physically violent toward him. Likewise, in *Sterling v. Upjohn Healthcare Serv., Inc.,* 299 Ark. 278, 772 S.W.2d 329 (1989), this court upheld the trial court's grant of summary judgment to the defendant, despite the plaintiff's employer's unfounded assertions that plaintiff was drunk at work, the employer's attempts to undermine the plaintiff, and the employer's eventual violent rhetoric regarding the plaintiff.

■ In the case before us, Faulkner presents facts indicating strained working relationships, a deliberate attempt to undermine her authority, false accusations of shoddy work, false accusations and rumors of mental illness, and, eventually, her being placed on leave. This conduct on the part of ACH and its representatives and employees, however, appears to be no more egregious than that involved in the two cases discussed above. Viewing the facts alleged in the complaint as true, and giving Faulkner all reasonable inferences therefrom, we hold that she has not alleged conduct that is beyond all possible bounds of human decency and utterly intolerable in a civilized society so as to rise to the level of outrage.

## V. Tortious Interference

Faulkner's fourth claim is that the trial court erred in dismissing her cause of action for tortious interference with a contractual relationship. The trial court did so on the basis of the lack of a third party who did not continue a contract with Faulkner because of the appellees' unauthorized conduct.

The elements of tortious interference are: (1) the existence of a valid contractual relationship; (2) knowledge of the relationship on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship; and (4) resultant damage to the party whose relationship has been disrupted. *Dodson v. Allstate Ins. Co., supra.* (citing *Brown v. Tucker,* 330 Ark. 435, 954 S.W.2d 262 (1997); *Cross v. Arkansas Livestock & Poultry Comm'n,* 328 Ark. 255, 943 S.W.2d 230 (1997); *United Bilt Homes, Inc. v. Sampson,* 310 Ark. 47, 832 S.W.2d 502 (1992)). A fifth requirement has been added by this court: the conduct of the defendant must be "improper." *Mason v. Wal-Mart Stores, Inc.,* 333 Ark. 3, 969 S.W.2d 160 (1998).

In addition to the above, another essential element of a tortious-interference-with-contractual-relations claim is that there must be some third party involved. *See Navorro-Monzo v. Hughes,* 297 Ark. 444, 763 S.W.2d 635 (1989). A party to a contract and its employees and agents, acting within the scope of their authority, cannot be held liable for interfering with the party's own contract. *See St. Joseph's Regional Health Center v. Munos,* 326 Ark. 605, 934 S.W.2d 192 (1996); *Fisher v. Jones,* 311 Ark. 450, 844 S.W.2d 954 (1993). Indeed, in *Navorro-Munzo v. Hughes, supra,* we held that a claim for tortious interference was defeated by the fact that there was no third party involved with whom a contract could be disparaged. *See also St. Joseph's Regional Health Center v. Munos, supra* (an agent of a doctor's employer could not have interfered with the doctor's contract because he stood in the shoes of one of the parties to the contract); *Palmer v. Arkansas Council on Econ. Educ., supra* (a party to a contract and its agents acting in the scope of their authority cannot be liable for interfering with the party's own contract).

In deciding this point, it is unnecessary to determine whether Faulkner, an at-will employee, indeed had any contract with ACH which was jeopardized by actions of the named appellees. This is because there was no third-party contract involved which was even alleged to have been interfered with by the named

appellees. The named appellees were all employees and agents of ACH. A third-party contract is essential to the cause of action. Hence, the only remaining issue is whether the employees were acting outside of the scope of their employment with ACH when they engaged in the alleged interference.

From the facts set out in Faulkner's complaint, even construing them in her favor and giving her all favorable inferences, it is clear that the appellees in this case were acting within the scope of their employment during the events described in the complaint. In every instance, the conduct described by ACH employees is directly related to ACH's reason for being, which is to provide care to its patients. Part of providing care to patients is the disciplining of employees who do not perform their jobs according to the standards prescribed by the employer hospital. Even if that discipline is administered unjustly, as alleged in Faulkner's complaint, it cannot be said that that activity is outside of the scope of employment. Likewise, even if Faulkner's co-workers and superiors severed all communication and attempted to "usurp her authority," as alleged, those actions still are within the scope of employment. In short, disciplinary actions and power struggles within a workplace setting, such as alleged here, do not exceed the scope of employment for purposes of agency or employment analysis.

We hold that Faulkner cannot maintain a cause of action for tortious interference because the named appellees were acting within the scope of their employment and because there was no interference with a third-party contract alleged. The trial court should be affirmed on this point as well.

## VI. Breach of Contract

Faulkner further claims that she had a contractual obligation from ACH to follow that hospital's grievance procedure. She urges this court to reinstate her claim for breach of contract because she alleges that her status as an at-will employee was altered by the existence of the ACH employee-grievance procedures.

Generally, an employer may terminate the employment of an at-will employee without cause. *See Crain Indus., Inc. v. Cass,* 305 Ark. 566, 810 S.W.2d 910 (1991); *Gladden v. Arkansas Children's Hospital,* 292 Ark. 130, 728 S.W.2d 501 (1987). An exception to the at-will doctrine is where an employee relies upon *an express*

*agreement,* such as in an employment manual, which disallows termination except for cause. *Gladden v. Arkansas Children's Hospital, supra; Robinson v. Langdon,* 333 Ark. 662, 970 S.W.2d 292 (1998).

Faulkner asserts that she is not an at-will employee because ACH adopted a grievance process through which employees could dispute adverse employment actions. As such, she appears to assert that she not only had protection against wrongful discharge but that she also had protection against reassignment, which is what happened in this case.

■ We conclude that Faulkner's breach-of-contract claim is meritless. ACH's alleged grievance process is not the same as a for-cause provision in an employment manual. In fact, Faulkner has not pled that the grievance process had anything to do ACH's decision to reassign her, which, Faulkner claims, was a breach of contract. Moreover, it is certainly not apparent from her complaint, even construing the facts in her favor, that the grievance process shields her from reassignment in the same way that a for-cause provision in an employee handbook shields an employee from wrongful discharge.

■ Faulkner was an at-will employee and, as such, was subject to reassignment by her employer. She has not pled any facts indicating otherwise. The trial court should be affirmed on this point.

## VII. Civil Conspiracy

Faulkner's final argument is that the trial court erred in dismissing her cause of action for civil conspiracy.

■■ To prove a civil conspiracy, a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive or immoral means, to the injury of another. *Chambers v. Stern,* 347 Ark. 395, 64 S.W.3d 737, (2002); *Dodson v. Allstate Ins. Co.,* 345 Ark. 430, 47 S.W.3d 866, (2001); *Mason v. Funderburk,* 247 Ark. 521, 446 S.W.2d 543 (1969). A civil conspiracy is not actionable in and of itself, but a recovery may be had for damages caused by acts committed pursuant to the conspiracy. *Chambers v. Stern, supra; Dodson v. Allstate Ins. Co., supra.* A civil conspiracy is an intentional tort which requires a specific intent to accomplish the contemplated wrong. *Chambers v. Stern, supra; Dodson v. Allstate Ins. Co., supra.*

In *Dodson v. Allstate Ins.*, *supra*, we noted that a corporation cannot conspire with itself, since that defeats the requirement of a combination of two or more persons acting to accomplish some unlawful or oppressive purpose. Thus, in order to sustain a claim for a civil conspiracy where agents of a corporation are involved, it is necessary to show that one or more of the agents acted outside of the scope of their employment, to render them a separate "person" for purposes of the conspiracy. *Dodson*, 345 Ark. at 445, 47 S.W.3d at 876. In *Dodson* we said that corporate agents could "not be held liable for civil conspiracy in the absence of evidence showing that they were acting for their own personal benefit rather than for the benefit of the corporation." *Dodson*, 345 Ark. at 445, 47 S.W.3d at 876 (citations omitted).

As was the case with tortious interference, this point turns on whether the individual appellees were acting within the scope of their employment when they conspired as alleged in Faulkner's complaint. Again, we must look to the stated reasons for the actions taken by the individual appellees. No facts are alleged in the complaint to the effect that the named appellees were acting for their own personal benefit to the elimination of any benefit for ACH. Only the conclusory statement is made that the individual appellees were "acting in their own interests and not in the best interests of ACH." That is not sufficient to withstand a Rule 12(b)(6) motion. *See* Ark. R. Civ. P. 8(a)(1); *Grine v. Board of Trustees*, *supra*. All of the actions alleged to be part of the conspiracy claimed by Faulkner involve patient care and relate to the effective practice of ECMO. Accordingly, we hold that the individual appellees were acting within the scope of their employment when they engaged in the conduct described in the complaint. Thus, there can be no civil conspiracy.

Affirmed.