# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 02-1832/02-1935

_____

| | | |
|---|---|---|
| Kathleen Suggs, | * | |
| | * | |
| Plaintiff-Appellee / | * | |
| Cross-Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Dorothy Stanley and | * | |
| Betty Hendricks, | * | |
| | * | |
| Defendants-Appellants / | * | |
| Cross-Appellees. | * | |

_____

Submitted: January 13, 2003
Filed: March 31, 2003

_____

Before WOLLMAN and MURPHY, Circuit Judges, and GRITZNER,[1] District Judge.

_____

MURPHY, Circuit Judge.

This defamation action was brought by Kathleen Suggs against Dorothy Stanley and Betty Hendricks, the sisters of her deceased companion. The jury ruled in favor of Suggs, and the sisters appeal from the judgment, contending that the

_____

[1] The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa, sitting by designation.

district court[2] erred by denying their motion for judgment as a matter of law and that it improperly admitted certain evidence. Suggs filed a cross appeal based on her unsuccessful attempt to assert a claim for intentional infliction of emotional distress. We affirm.

I.

Dorothy Stanley and Betty Hendricks had one brother, Gilbert Wicker, who was involved in a romantic relationship with Kathleen Suggs for approximately twelve years prior to his death. The father of the three siblings died in 1994, and the next year their mother, Mamie Wicker, transferred to Gilbert property which she had inherited from her husband. The property included a certificate of deposit for $10,000, a savings account of about $25,000, and a house in Stamps, Arkansas. Both the certificate of deposit and the savings account were payable to Mamie in the event of Gilbert's death, and she continued to live in the home in Stamps. After the transfer in 1995, Gilbert executed a will which provided that if he died before Mamie, the properties would be placed in trust for her with Kathleen Suggs as trustee. Suggs was also made executrix of his estate.

Evidence at trial indicated that the relationship between Gilbert and his sisters had deteriorated over the years. Gilbert suffered from renal failure for a long time and needed two kidney transplants. He had asked his sisters to consider donating a kidney before each transplant operation, and there was a conflict in the evidence about whether they were tested to see if they could qualify as donors. Suggs testified that they had not returned Gilbert's phone calls, and they acknowledged on cross examination that they had not spoken to their brother for some ten years after he

---

[2] The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

talked to them about his need for a transplant. Gilbert's aunt, his lawyer, and his neighbor also testified that the sisters and Gilbert had become estranged.

Dorothy Stanley obtained guardianship over the person and assets of Mamie in 1999, as well as power of attorney, and moved her mother from Stamps to Shreveport, Louisiana, where she lived. Dorothy also sued to recover the properties that Mamie had turned over to Gilbert. In her complaint Dorothy alleged that her mother had been incompetent when she signed over the property because she had been drugged by her doctor and Gilbert. Suggs contends that Mamie chose to transfer her property to Gilbert in order to prevent Dorothy and Betty from squandering it and leaving Mamie without adequate financial support, and Gilbert's aunt testified that she had not supported Dorothy's lawsuit because of worry about what would happen to the property given the costs incurred in the guardianship.[3]

At the time Dorothy's lawsuit was served, Gilbert was hospitalized because his second kidney transplant was failing. He did not file a responsive pleading, but on May 28, 1999, he told his attorney to draw up a new will leaving all his property to Suggs and naming her as his executrix. Mamie was not mentioned in the new will. On July 2, 1999, Gilbert was found dead.

Suggs testified that she discovered Gilbert's body after she had been unable to reach him on the phone and went to his house to check on him. After she found him dead, she called the Little Rock police who went to the house and started an investigation. They contacted Dorothy as next of kin to report Gilbert's death and advised her to come to claim the body. Dorothy alerted her sister Betty, whose husband agreed to drive them to Little Rock. Dorothy also called her attorney who told her to videotape the contents of Gilbert's house.

---

[3] There was evidence that the chancery court had ordered Dorothy to file a report regarding guardianship expenditures of $41,000 for a sixteen month period.

After two hours on the scene, the police completed their investigation and determined that Gilbert's death was a suicide. Before leaving, they instructed Suggs to secure the house, and she then contacted Gilbert's lawyer. The lawyer advised Suggs to remove all valuables and to make sure the house was locked and soon arrived to help secure it. While at the house, Suggs received a call from Gilbert's aunt who told her that Dorothy and Betty were on their way to Little Rock and suggested that she call them. Gilbert's lawyer advised Suggs to tell the sisters that they did not have to drive all the way to Little Rock because his body could be released by fax to the funeral home in Stamps.

Suggs called Dorothy's cell phone and told her that the house was secure and the sisters did not need to come to Little Rock, but Dorothy replied that they were already underway. Suggs told Dorothy that she would be gone by the time they arrived. Before locking up the house, Suggs removed the most valuable items and Gilbert's personal records for use in administering his estate. She then went over to the neighbor's house.

After Dorothy received the call from Suggs, a call was placed on Betty's cell phone to the Little Rock Police Department. Although the sisters deny reporting that Suggs was in Gilbert's house, they admit that one of them may have inquired as to whether it was appropriate for Gilbert's girlfriend to be in the house before any of his relatives arrived. It is undisputed, however, that three minutes after the call from Betty's cell phone, the police dispatcher broadcast a "burglary in progress" at Gilbert's address, and officer Bill Bentley was sent to investigate. Officer Bentley testified at trial that the dispatcher had told him that a burglary had been reported by a woman who said she was Gilbert's sister on the way to Little Rock.

When Bentley arrived at Gilbert's house, Suggs was standing in the neighbor's yard. She went over to talk with Bentley, and he informed her that he was responding to a burglary call at that address. Suggs told him that she had her own key to the

house, and Bentley left after concluding that there had been no burglary. When Dorothy and Betty arrived in Little Rock, they attempted to get Suggs to open Gilbert's house for them, but she refused and they sought assistance from the police. After hiring a locksmith, they gained entrance to the house and videotaped its contents.

After Gilbert's funeral, Dorothy began making phone calls to the Little Rock Police Department regarding his death. She told the police that she did not believe his death had been a suicide and that she thought Suggs had been involved. She mentioned a note found at the death scene which had been written and signed in block print and which mentioned love for a dog but nothing about Mamie. Dorothy said that Gilbert never printed his name, so it would have been uncharacteristic to do so in his final note. She added that when she and Betty went to Gilbert's house after his death, all the papers found there had been signed by Gilbert in longhand rather than printed, and neither she nor Betty were able to find a notepad matching the paper used for the suicide note. Dorothy also stated that it was not possible that Gilbert would have thought of his dog before dying, but not his mother. Moreover, if his death had been a suicide, there must have been another note Suggs did not want anyone to see. Dorothy also reported that Gilbert's personal papers had been removed from his house after his death.

On July 22, 1999, Dorothy sent a letter to homicide detective Steve Moore which contained similar allegations. She also requested that the police check the suicide note to make sure Gilbert's fingerprints were on it because she did not believe he had written it.[4] In addition, she alleged that Suggs had tried to determine "how much time she had" before the sisters arrived at the house, suggesting she needed

[4] The letter stated: "Please check the note to make sure [Gilbert's] fingerprints were on it because I DO NOT believe he wrote this note. I believe there was a note but one that Ms. Suggs does not want anyone else to see."

time to accomplish something before they got there. Dorothy attached copies of Gilbert's wills to the letter to show that Suggs stood to benefit from his death. The copy of the most recent will indicated on its face that Betty had faxed it to Dorothy for inclusion with the letter. Detective Moore testified that he had received and considered the letter and then placed it in a police file.

The Pulaski County Coroner was called as a rebuttal witness at trial after Betty had testified that she had had no contact with him. The coroner testified that he believed Betty was the woman who had accompanied Dorothy to his office to discuss facts related to Gilbert's death. He positively identified Dorothy in the courtroom and said she had been his primary contact about Gilbert's death but he was not absolutely certain that Betty had been the other woman who came to his office.

When Dorothy discovered that a default judgment could not be obtained against Gilbert after he was deceased, she filed a new complaint naming his estate as the respondent. Suggs answered as executrix. The chancery court subsequently ruled that since Dorothy had not proven that Mamie was incompetent at the time she transferred her property or that Gilbert had used undue influence over her, the property had remained in Gilbert's estate and later passed to Suggs as the designated heir.

In her role as executrix of Gilbert's estate, Suggs had contacted the Little Rock police before responding to Dorothy's lawsuit. She was referred to detective Steve Moore who told her that Dorothy had alleged that Gilbert's death was not a suicide. Suggs' attorney obtained a copy of Dorothy's letter to Moore through the Freedom of Information Act and later initiated this diversity action. In her complaint Suggs alleged that Dorothy had defamed her and caused her damage of more than $100,000. The alleged acts of defamation included statements made in the telephone call to the police the day of Gilbert's death, Dorothy's letter to detective Moore alleging that Gilbert's death had not been a suicide and that Suggs had concealed his actual note,

and statements by Dorothy that Suggs had attempted to withdraw money from the estate which really belonged to Mamie. After discovery began, Suggs amended her complaint to include Betty as a defendant and to allege that the sisters had conspired in the defamatory acts.

Suggs testified at trial that Dorothy's letter to detective Moore and the statements made to the Little Rock police and the county coroner had damaged her reputation with the police department and with anyone else who heard the accusations. She also testified that the sisters had conspired against her for their gain and had hurt her during a very vulnerable time, that she had suffered great stress, and that she had been prevented from properly grieving Gilbert's death. Detective Moore testified that the police had taken the allegations in the letter seriously and that this type of letter would affect a person's reputation with the department. He stated that even though Gilbert's death had been ruled a suicide, Dorothy's letter would remain in the file indefinitely and could be reconsidered in the future. He also testified that he would not want a letter like that written about him.

The jury found that both sisters had defamed Suggs and awarded her a total of $50,000 in damages ($10,000 compensatory and $30,000 punitive damages against Dorothy; $5,000 compensatory and $5,000 punitive damages against Betty).

The sisters appeal from the judgment. They also contend that the district court erred by denying their motion for judgment as a matter of law because there had been insufficient evidence of damage to Suggs' reputation, the claimed defamatory statements were opinions rather than statements of fact, and a case had not been made against Betty. They claim that the district court abused its discretion by allowing hearsay evidence from officer Bentley and irrelevant evidence about their relationship with their brother and about Dorothy's lawsuit. In her cross appeal Suggs argues that the district court abused its discretion by not allowing an amendment to correct any pleading defect in her claim for intentional infliction of emotional distress.

## II.

Appellants argue they are entitled to judgment in their favor. They contend that the district court erred by denying their motion for judgment as a matter of law because the challenged statements were privileged, Suggs failed to establish required elements of defamation, and there was insufficient evidence to support a judgment against Betty. We review de novo the denial of a motion for judgment as a matter of law, see EFCO Corp. v. Symons Corp., 219 F.3d 734, 738 (8th Cir. 2000), consider the evidence in the light most favorable to the verdict, and will only reverse for insufficient evidence if no reasonable juror could have returned a verdict for the prevailing party. Id. The substantive law we must apply in this review is that of Arkansas. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

In the alternative the sisters seek a new trial on the basis that the district court abused its discretion by allowing hearsay evidence from officer Bentley and other irrelevant and prejudicial evidence. We review the district court's evidentiary rulings for a clear abuse of discretion. See United Fire & Cas. Co. v. Historic Preservation Trust, 265 F.3d 722, 726 (8th Cir. 2001).

## A.

To prove defamation under Arkansas law, a plaintiff must show that she was defamed by a false statement of fact which referred to and damaged her and was published by the defendant. See Faulkner v. Arkansas Children's Hospital, 69 S.W.3d 393, 402 (Ark. 2002). The defamatory statement of fact must have been communicated to others and must have detrimentally affected the plaintiff's reputation. See Ellis v. Price, 990 S.W.2d 543, 547 (Ark. 1999). Although the plaintiff "must establish actual damage to his reputation, … the showing of harm is slight." Id. The defamatory statement must also "imply an assertion of [any] objective verifiable fact." Faulkner, 69 S.W.3d at 402.

-8-

Appellants argue that Suggs failed to prove that defamatory statements of fact were communicated to others which detrimentally affected her relations with them. They argue that the statements made in Dorothy's letter and in the calls and visits to the police and coroner were covered by qualified privilege, that nothing more than opinions had been expressed, and that there was insufficient evidence of harm to Suggs' reputation. Betty also argues that there was insufficient evidence to show that she took part in any defamatory act.

Under Arkansas law a communication is covered by qualified privilege "when it is made in good faith upon any subject-matter in which the person making the communication has an interest … and to a person having a corresponding interest or duty, although it contains matters which, without such privilege, would be actionable." Wal-Mart Stores, Inc. v. Lee, 74 S.W.3d 634, 653 (Ark. 2002). Qualified privilege must be exercised in a reasonable manner and is lost if abused. Thiel v. Dove, 317 S.W.2d 121, 123 (Ark. 1958). The privilege is abused "if the speaker is motivated by malice rather than by the public interest that calls the privilege into being." Id. The question of whether malice has been established and the communication shown not to be privileged is a question of fact for the jury. Id.

Suggs presented evidence that after Gilbert's death the sisters shifted their animosity from him to her and that they were motivated by their desire for control over Mamie's property. The jury was correctly instructed on defamation, and the verdict indicates that the jurors found that the statements made to the police and the coroner about Suggs had been motivated by spite and desire for personal gain, rather than good faith or public interest. After examining the record in the light most favorable to the verdict, we conclude there was sufficient evidence from which the jury could find that the sisters acted out of malice and that the statements to the police and coroner were therefore not covered by qualified privilege.

Appellants claim that their statements were only opinions, not statements of fact as required by Arkansas law. The Arkansas Supreme Court has explained, however, that "where the words, together with the attendant circumstances, are alleged to charge a crime, they are actionable." Bland v. Verser, 774 S.W.2d 124, 125 (Ark. 1989). Whether the combination of words and related circumstances charge a crime is a question of fact for the jury. Id. The defendant in Bland, for example, had argued that he was only expressing his opinion by suggesting that the plaintiff was either very stupid or had colluded in converting funds. Because a "fair and reasonable inference" could be drawn from the defendant's statements that the plaintiff was guilty of a criminal act, the statements were factual and actionable. See Bland, 774 S.W.2d at 125–26. Here, Suggs presented evidence that Dorothy's letter to the police contained allegations which were also made during several phone calls and visits to the police and the coroner. The statements suggested that Suggs had been involved in Gilbert's death for her own financial interest and that she had falsified Gilbert's suicide note and hidden the authentic note. In these circumstances a "fair and reasonable inference," id. at 125, could be drawn that the statements had alleged that Suggs was guilty of obstruction of justice or tampering with evidence, and had implied she might even be guilty of murder. Because of the allegations that Suggs had committed at least one crime, the letter and oral statements contained statements of fact, not merely opinion.

Under Arkansas law a plaintiff's testimony that her reputation has been injured by defamatory statements can be sufficient evidence of harm. See Hogue v. Ameron Inc., 695 S.W.2d 373 (Ark. 1985). In Hogue, for example, a police officer claimed defamation by a letter to a state official reporting that he had driven in an unlicensed vehicle and yelled obscenities while on duty. He testified at trial that his reputation had been damaged by the resulting investigation, and another witness testified "rather vaguely" about the damage. See Hogue, 695 S.W.2d at 374. The Arkansas Supreme Court held that this was sufficient evidence of damage to submit the defamation claim to the jury. Id. The supreme court also held in a more recent case that harm to the

plaintiff's reputation can be established by evidence that others think less of the plaintiff because of defamatory statements or believe that the plaintiff did what had been alleged. See Little Rock Newspapers, Inc. v. Fitzhugh, 954 S.W.2d 914, 920–21 (Ark. 1997).

After examining the trial record, we conclude that under Arkansas law there was sufficient evidence of damage to Suggs' reputation. Suggs testified that she was very upset after learning that appellants had suggested to the police that she was involved in the death of Gilbert, with whom she had a close relationship for over twelve years, and that she had tampered with evidence and falsified a suicide note. She also testified that she believed their allegations had damaged her reputation with the Little Rock Police Department and with everyone who heard the accusations or read the letter. She added that her fear of how people were reacting was causing her immense stress at a particularly difficult time in her life. Officer Moore testified that a letter like Dorothy's was taken seriously by the police, that it could definitely harm a person's reputation with the department, and that he would not want such a letter written about him or placed in a police investigation file. Gilbert's attorney testified that Dorothy's letter would cause anyone to wonder whether the allegations were true, that the allegations could be devastating to Suggs' reputation, and that the letter is readily available to anyone through the Freedom of Information Act. There was additional evidence to show how damaging the allegations in the letter could be since Suggs' best friend testified that although the accusations seemed absurd, it was only human to have some doubt about whether the statements were true. Given this record, appellants were not entitled to prevail on their motion for judgment on the basis of insufficient evidence of damage to Suggs' reputation.

The final issue is whether Suggs made out a case that Betty had conspired with her sister in the acts of defamation. To succeed with this theory Suggs had to show that Betty and Dorothy "combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or

immoral, but by unlawful, oppressive or immoral means, to the injury of another."
Faulkner, 69 S.W.3d at 406. The initial phone call to the Little Rock police was
shown to have been made on Betty's cell phone, and this call initiated a series of
contacts by the sisters about Gilbert's death.[5] There was evidence from which the
jury could find that Betty was the other woman who went with Dorothy to the coroner
to discuss concerns related to Gilbert's death. There was also evidence that Betty
provided Dorothy with the copy of Gilbert's second will for attachment to her letter
to the police. An inference could be drawn by the jury that the purpose of the
attachment was to suggest Suggs had a motive for murder or at the very least, that
Suggs knew she could benefit from Gilbert's death. Other evidence also tended to
show that the sisters had conspired together, motivated by animosity and the desire
to recover their mother's property, including evidence that Betty had encouraged her
sister in the lawsuit to retrieve property from Gilbert and his estate, had accompanied
Dorothy throughout, and had testified in support of Dorothy at the chancery court
proceeding. Because of the way that the jury allocated damages, it obviously found
Betty's involvement to have been less than Dorothy's, but we conclude there was
sufficient evidence for the jury to find that Betty had knowingly combined with
Dorothy to defame Suggs.

In sum, the district court did not err by denying the motion for judgment as a
matter of law on any of the asserted grounds.

---

[5] Officer Bentley testified at trial about this first call, but the police dispatcher
did not. The report of what was said to the dispatcher, by a woman representing
herself as Gilbert's sister on the way to Little Rock, would therefore be hearsay if
offered to prove the truth of its content. Accordingly, we will not consider the
content of statements reported to have been made to or by the dispatcher.

B.

Officer Bentley testified that he had been directed to Gilbert's residence by the dispatcher who reported that an "unknown caller called southwest substation and advised that there was a burglary in progress at her deceased brother's residence" and that "the caller said that she was … en route from Louisiana." The district court admitted this evidence over a hearsay objection to show the officer's understanding of the nature of the call to which he was responding, and it admitted Bentley's written report as a business record. While appellants concede the officer's own observations in his report are admissible as a business record, they argue that repetition of the dispatcher's statements was inadmissible hearsay. We review the district court's evidentiary rulings for a clear abuse of discretion. See United Fire & Cas. Co., 265 F.3d at 726.

Officer Bentley's evidence about what he was told by the dispatcher was not hearsay because it was not offered for the truth of the matter asserted. Fed. R. Evid. 801, see also supra note 5. The statements were admitted in order to explain why Bentley went to Gilbert's house even though police had already been there earlier that day to investigate his death. See United States v. Collins, 996 F.2d 950, 953 (8th Cir. 1993) (out of court statement to officer not hearsay if offered to explain why investigation was undertaken); see also Nottingham v. Arkansas, 778 S.W.2d 629, 630 (Ark. App. 1989) (officer's testimony concerning phone call not hearsay when offered to explain what prompted his investigation). The district court also instructed the jury that the statements were to be used only to show why the officer went to Gilbert's house, not to prove that anything stated by the dispatcher or the caller was true. Since the evidence was thus not hearsay and the jury was properly instructed on its use, the district court did not abuse its discretion by allowing officer Bentley's testimony and written report into evidence.

-13-

Appellants argue that the district court abused its discretion by allowing Suggs to present evidence that was prejudicial and irrelevant, including evidence relating to Gilbert's illness, the lawsuit to recover the mother's property, and Dorothy's guardianship of their mother and her assets. They charge that this evidence was offered to show that they were persons of bad character and thus inadmissible under Fed. R. Evid. 404(b). Suggs responds that the evidence was relevant and necessary to her claims that the sisters conspired to defame her, for punitive damages, and to counter their defense of qualified privilege. She also says the evidence shows that she became the object of the sisters' animosity because of the transfer of their mother's property.

A district court is afforded wide latitude in determining issues of relevancy, and we will only reverse if there is a clear abuse of discretion. See EFCO Corp., 219 F.3d at 739. This evidence was not offered to prove character, but was relevant to explain the sisters' hostile attitude toward Suggs and helped show that they had worked in concert to regain possession of their mother's property, first from their brother and then later from Suggs. It also helped establish malice, which was necessary to overcome the sisters' affirmative defense of qualified privilege and to obtain punitive damages. See Thiel, 317 S.W.2d at 123 (conditional privilege of providing information to police is lost if motivated by malice rather than the public interest); Flynn v. McIlroy Bank & Trust, 697 S.W.2d 114, 116 (Ark. 1985) (award of punitive damages in a private figure defamation case requires proof of ill will, malice, or bad intent). The district court did not abuse its discretion by finding the relevance of the evidence outweighed any prejudicial effect and admitting it.

## III.

After a thorough review of the record, we conclude that the district court did not abuse its discretion in its evidentiary rulings and that there was sufficient evidence under the requirements of Arkansas law to support the jury findings that

-14-

Gilbert's sisters had defamed his companion. Accordingly, we affirm the judgment of the district court and dismiss the cross appeal as moot.[6]

GRITZNER, District Judge, dissenting.

The essential elements of a cause of action for defamation in Arkansas have been outlined as follows:

> An action for defamation turns on whether the communication or publication tends or is reasonably calculated to cause harm to another's reputation.
> . . . .
> In order to establish a claim of defamation, a party must prove the following elements: (1) The defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages.

Little Rock Newspapers, Inc. v. Fitzhugh, 954 S.W.2d 914, 918 (1997) (citations omitted). Because I believe the majority opinion essentially eliminates the sixth element, I must respectfully dissent.

"A plaintiff must prove that the defamatory statement(s) have been communicated to others and that the statements have detrimentally affected those relations. The law does not require proof of actual out of pocket expenses." Ellis v. Price, 990 S.W.2d 543, 546-47 (Ark. 1999). "A plaintiff must establish actual damage to his reputation, but the showing of harm is slight." Id. (citing United Ins. Co. of Am. v. Murphy, 961 S.W.2d 752, 756 (Ark. 1998)).

---

[6] Suggs argues in her cross appeal that if appellants succeed with their appeal, her claim for intentional infliction of distress should be reinstated because she pled such a claim and the district court abused its discretion by not allowing her to amend it.

The majority relies upon <u>Hogue v. Ameron Inc.</u>, 695 S.W.2d 373, 374 (Ark. 1985), for the principle that a plaintiff's testimony that her reputation has been injured can be sufficient evidence of harm, and upon <u>Little Rock Newspapers, Inc.</u>, 954 S.W.2d at 920-21, for the concept that harm to a plaintiff's reputation can be demonstrated by evidence that others think less of the plaintiff because of the defamatory statements. The <u>Hogue</u> court concluded that plaintiff had testified regarding harm to his reputation, but the court did not describe the nature of that evidence. <u>Hogue</u>, 695 S.W.2d at 374. The <u>Fitzhugh</u> court later observed "[n]ot withstanding the holding in <u>Hogue</u>, *the question still remains* as to what particular type of proof is sufficient to sustain a jury's verdict in favor of a plaintiff in a defamation action." <u>Fitzhugh</u>, 954 S.W.2d at 920-21 (emphasis added).

In 1998, Arkansas abandoned the per se damages rule in defamation cases. <u>United Ins. Co. of Am.</u>, 961 S.W.2d at 755. The Arkansas Supreme Court announced, "[f]rom the date of this opinion forward, we hold that a plaintiff in a defamation case must prove reputational injury in order to recover damages." <u>Id.</u> at 755. Therefore, in cases in which a private plaintiff sues a private defendant and a defamatory statement is shown, the damage element could no longer be presumed.[7] <u>Id.</u>

What constitutes actual damages in an Arkansas defamation action is helpfully illustrated by the quality of evidence in <u>Ellis v. Price</u>. <u>Ellis</u>, 990 S.W.2d at 543. In <u>Ellis</u>, the plaintiff was three months pregnant when two women called her husband and told him the baby was not his. <u>Id.</u> at 545. Ellis brought a defamation suit alleging damages of "injury to her reputation, personal humiliation, embarrassment, weight loss, difficulty sleeping, and loss of appetite." <u>Id.</u> The case proceeded to trial,

---

[7] The doctrine of presumed damages had already been abolished in defamation cases where a private plaintiff sues a media defendant in <u>Little Rock Newspapers, Inc. v. Dodrill</u>, 660 S.W.2d 933 (1983).

where defendants' motion for a directed verdict at the close of evidence was denied and the jury awarded significant compensatory and punitive damages.  Id.

The Arkansas Supreme Court upheld the Ellis verdict on appeal.  Id. at 546. The court emphasized that a showing of damages was required to recover in a defamation case and, although slight, Ellis *had* suffered damages.  Id. at 547.  The court pointed to Ellis' testimony at trial detailing the damage to her relationship with her husband.  Id. at 547-48.  Ellis testified that although her husband said he did not believe the accusation, he treated her as if he believed it.  Id.  She testified that after receiving the phone call, her husband:  (1) was angry; (2) did not sleep in the same room with her for two or three months; (3) doubted her and questioned her whereabouts; (4) would only have brief and infrequent conversations with her; and (5) would make efforts to avoid touching her when they passed each other.  Id. at 548. Ellis also testified she went to her parents' home in Memphis because there was really no reason to be in Little Rock since she and her husband did not have a relationship. Id. Ellis' husband testified that he was disturbed by the allegation and questioned his wife's honesty.  Id.  Thus, the harm in Ellis, while limited to her relationship with her spouse, was specific and based upon facts rather than fears, suspicions, or conclusions by the plaintiff.  The Ellis court follows Hogue in allowing the plaintiff's own testimony to be the source of the record evidence, Ellis, 990 S.W.2d at 547, but also requires that it demonstrate actual harm.  Id.

This analysis is further developed by the recent case of Faulkner v. Arkansas Children's Hospital, wherein the Arkansas Supreme Court found the trial court properly dismissed a defamation action because the plaintiff failed to plead facts supporting actual damage to reputation.  Faulkner v. Ark. Children's Hosp., 69 S.W.3d 393, 403 (Ark. 2002).  The lengthy facts in Faulkner detail a story of untrue retaliatory statements made about the plaintiff which contributed to her suspension and eventual demotion.  Id. at 396-99.  Faulkner was a nurse coordinator for a special mobile unit at Arkansas Children's Hospital (ACH).  Id. at 396.  After two years at

ACH, members of the hospital staff engaged in conduct aimed at removing Faulkner from her position. Id. The conduct included letters, phone calls, and meetings with ACH administration, alleging Faulkner was unstable and blaming her for errors for which she was not responsible. Id. at 397. Ultimately, ACH determined Faulkner was unstable and demoted her from the coordinator position. Id. at 399. Faulkner sued the hospital and the certain staff on various counts including defamation. Id. The defendants moved to dismiss the case under Arkansas Rule of Procedure 12(b)(6). Id.

The court found Faulkner did not prove the necessary elements of defamation under Arkansas law and dismissal was proper. Id. at 402-03 ("Faulkner has not pled specific facts demonstrating that she has suffered actual damage to her reputation, but has only pled a conclusion to that effect. That is not enough to withstand a Rule 12(b)(6) motion.").

In this case, Suggs did offer testimony that she believed the allegations had damaged her reputation and that she suffered substantial distress as a result of the conduct during this difficult time in her life. However, if the developing law in Arkansas has meaning, a plaintiff's own conclusions or fears about injury to reputation must be supported by evidence that those conclusions or fears have some basis in fact. For example, "[p]roof of damage to reputation may include: (1) proof that people believed the plaintiff to be guilty of the conduct asserted in the publication, or (2) proof that people thought less of the plaintiff as a result of the publication's defamatory content." Little Rock Newspapers, 954 S.W.2d at 921.

It is axiomatic that no injury to reputation can result when the person receiving the communication knows it is not true. The report of a burglary in progress at the residence was, within minutes, determined by the police to be untrue. The various communications to the Little Rock Police Department may not have been protected by a qualified privilege under the circumstances of this case, but they were still made

by concerned family members questioning the conclusion of suicide and inviting further investigation by law enforcement. The record reflects this is commonly seen by the police in cases of suicide. Police utilize such information in the process of their investigation which by its essential nature withholds a determination of the accuracy of the allegations pending confirmation. In fact, the Little Rock Police Department concluded the death was a suicide and determined to close any further investigation. Thus, the only persons to whom the defendants published the allegations found them to be in all material respects, if not totally, false.

The allegedly defamatory material is in the police files, only available pursuant to a Freedom of Information request and then possible disclosure. The only requests in the record came from attorneys for the plaintiff. There is no record of other publication from the police files. Even assuming a Freedom of Information request might allow for damaging publication, it has yet to occur.

Officer Moore's testimony that such a communication is taken seriously by the police could harm a person's reputation, and that he would not want such a letter written about him or placed in a police file, does not alter the analysis. That such a communication is annoying or could harm a person's reputation does not prove the element of damage. That police take an allegation seriously does not rise to defamation in the face of the investigatory process with a contrary conclusion.

Other than Officer Moore, the only witness who read the letter was Suggs' friend Connie Tapp. Tapp only knew about the letter because Suggs showed it to her, and she testified the letter did not affect her opinion of Suggs.

Suggs worries she lost her job because of the letter, yet she offers no proof anyone at Ryder ever saw the letter or knew of the accusations. In addition, she was terminated in June 2001, which was eleven months after the letter was sent to the LRPD.

Suggs testified her relationship with Mamie was noticeably affected the day before Gilbert's funeral. This was weeks before the allegedly defamatory letter was sent. Furthermore, Suggs testified she had not seen Mamie for over a year and a half prior to Gilbert's death.

Proof of a claim of defamation requires a showing of damages. Little Rock Newspapers, 954 S.W.2d at 918. While the harm to reputation may be slight under Arkansas law, Ellis, 990 S.W.2d at 547, it must still meet that minimum. While a plaintiff's own testimony may be the source of the evidence, the substance of the evidence must still demonstrate actual harm. Id. I believe the district court erred in not sustaining the Motion for Judgment as A Matter of Law, and I would reverse.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.