The Honorable Lindsley Smith State Representative 340 North Rollston Avenue Fayetteville, Arkansas 72701-4178
Dear Representative Smith:
I am writing in response to your request for an opinion on a number of questions involving Act 637 of 2007, the "Commercial Driver Alcohol and Drug Testing Act," codified at A.C.A. § 27-23-201 through-211 (Supp. 2007). Specifically, you state the following facts and pose the following list of questions:
 The City of Fayetteville's Human Resources Director has raised numerous questions as to the implementation of the provisions of Act 637 of 2007, for which the office has been unable to provide satisfactory answers. As such, I am requesting a formal Arkansas Attorney General's Opinion on the following questions:
 1. As a threshold question, does A.C.A. § 27-23-209(e), which states: "The penalties of this section shall not apply to the State of Arkansas, an agency of the state, or a political subdivision of the state" mean that the enhanced testing and reporting requirements of Act 637 do not apply to cities, or does it mean that cities must implement Act 637, but if they don't, they face no penalties under the Act?
 If the answer to this question is that cities are required to implement Act 637, please advise as to the following questions that arise from a thorough read[ing] of the Act: *Page 2 
 2. Questions Pertaining to "Which Employees are Covered Under the Statute":
 a. Does the statute distinguish between employees with full time, part time, temporary, and/or permanent employment status?
 b. Does the statute distinguish between employees whose positions require a Commercial Driver's license (as opposed to employees who happen to merely possess a CDL, regardless of the job duties of their position)?
 c. Does the statute apply to employees who are merely acting as temporary back up in a position otherwise requiring a CDL?
 d. Does the statute apply to employees who are promoted into a position requiring a CDL?
 3. Questions Pertaining to "Protocol When Someone Fails a Background Check:"
 a. This program is administered by the Dept. of Finance and Administration. Many of their services have appellate procedures. What is an employee or prospective employee's appellate procedure if they fail a background check and wish to contest it? And what is the employer's obligation while the employee is appealing?
 b. The statute encourages people going through rehabilitation programs in order to mitigate a positive background check, but does not specify the timing of said rehabilitation efforts. If a new hire fails a background check, at what point in time must the person have completed a rehabilitation program? For example, what if they failed a drug test two years previously but completed a rehabilitation program two weeks before being hired? Similarly, what if such a person offers to complete a rehabilitation program in order to be hired or as a condition of employment? At what point is it "too late" to use a rehabilitation program *Page 3 
to mitigate a positive drug test or positive background check?
 c. What if someone who fails the background check produces documentary evidence of having completed an Employee Assistance Program (EAP) but it's not in the database?
 d. The statute primarily addresses hiring and is unclear about retaining existing employees (although it states they are to have the background checks). Do we have to terminate existing employees who fail the background check, may we run them through a substance abuse program, and/or may we transfer them to a non-CDL position? If we run them through a substance abuse program, how is their successful completion of it reported to the database? Is it the medical provider's responsibility, our responsibility, or the responsibility of the another person or entity?
 e. What are the standards for a rehabilitation program sufficient to mitigate having failed a drug test? Should it be a rehabilitation program with a substance abuse professional of certain certifications or qualifications? Should we go by whether the program meets DOT standards?
 f. The Arkansas Civil Rights Act tracks the Americans with Disabilities Act case law. Given the 8th Circuit Court of Appeals' position in Miners v. Cargill Communications, Inc., 113 F.3d 820
(8th Cir. 1997), what is your opinion on whether the statute in question creates potential legal liability for employers with regard to "perceived a s" cases under the ACRA and ADA?
RESPONSE
In response to your initial question, in my opinion cities must implement Act 637 for covered employees, but if they don't, they face no penalties under A.C.A. § 27-23-209. The answer to part (a) of your second question regarding full-time versus part-time drivers, depends, ultimately on federal law. Consultation with federal *Page 4 
officials and/or with the Fayetteville City Attorney is advisable on compliance with federal law. I can point you, however, to the provisions of 49 C.F.R. § 382.107, which defines "Driver" as including "[f]ull time, regularly employed drivers, casual, intermittent or occasional drivers; leased drivers and independent owner-operator contractors." In response to Question 2(b), regarding persons who possess commercial driver's licenses, but who are not required to, again, the answer is controlled by federal law. Consultation with federal officials is likewise advisable on this question. One provision in the applicablestate subchapter addresses a related question and provides that: "This subchapter does not apply to an individual who is exempt from holding a commercial driver's license notwithstanding whether the individual holds a commercial driver's license." In response to Question 2(c), regarding temporary back-up drivers, see my answer to Question 2(a). In response to Question 2(d), regarding promoted drivers, in my opinion the answer is "yes." In response to Question 3(a), regarding appellate procedures, it is my understanding that the Department of Finance and Administration will be promulgating regulations to implement the subchapter, but has not yet done so. The current subchapter provides no express procedures in this regard. Questions on this subject should thus be referred to the Arkansas Department of Finance and Administration, Office of Driver Services. In response to Question 3(b), regarding the timing of rehabilitation programs, state law does not address this question. The applicable federal regulations address "substance abuse professionals" and painstakingly set out the applicable procedures in this regard. Again, consultation with the federal officials or the City Attorney is advisable if further information is needed on this issue. In response to Question 3(c), regarding the completion of an EAP, the applicable subchapter does not address this question. This issue may be one that is ultimately addressed in the implementing state regulations. It is my understanding, however, that the database does not currently contain information related to EAP or rehabilitation completion, and the responsibility for determining compliance with those requirements is placed on the employer. I suggest that questions in this regard be forwarded to the Office of Driver Services. In response to Question 3(d), regarding the appropriate action an employer must take when a person fails a background check, state law does not expressly address this question. It is clear, however, that unless an employee has successfully completed a treatment or education program, an employer will be penalized for "hiring" such person. Federal law leaves some discretion to the employer as to the precise job action taken.See 49 C.F.R. § 40.305(b). In response to Question 3(e), regarding the standards for rehabilitation programs, federal regulations address this issue. Finally, in response to Question 3(f) regarding potential liability under the *Page 5 
Arkansas Civil Rights Act or the Americans with Disabilities Act, I cannot answer this question in the abstract in the absence of particular facts. In an effort to be helpful, however, I have set out a discussion of the Miners case and some surrounding law.
Question 1 — As a threshold question, does A.C.A. § 27-23-209 (e),which states: "The penalties of this section shall not apply to theState of Arkansas, an agency of the state, or a political subdivision ofthe state" mean that the enhanced testing and reporting requirements ofAct 637 do not apply to cities, or does it mean that cities mustimplement Act 637, but if they don't, they face no penalties under theAct?
In my opinion cities must implement Act 637, but if they don't they face no penalties under A.C.A. § 27-23-209. I cannot hypothesize in the abstract, what other consequences might ensue from failing to comply with the state Act. Penalties for non-compliance with the federal law may obtain, however. See 49 C.F.R. § 382.507.
The "Commercial Driver Alcohol and Drug Testing Act," codified at A.C.A. § 27-23-201 through-211 (Supp. 2007), which heavily references federal law, [1] requires certain employers and "medical review officers" to report the valid positive drug and alcohol test results of commercial drivers to the state Office of Driver Services. A.C.A. § 27-23-205. That Office is required to maintain the information in the "Commercial Driver Alcohol and Drug Testing Database" for at least three years. A.C.A. § 27-23-206 (Supp. 2007). Employers are required to "submit a request for information from the Database for each employee who is subject to drug and alcohol testing." A.C.A. § 27-23-207(a). Penalties are levied against employers who knowingly fail to check the Database as required; for knowingly hiring an employee with a record of a positive alcohol or drug test (unless they have successfully completed a treatment program); and for knowingly failing to report certain drug test occurrences. A.C.A. § 27-23-209.
In response to your initial question, concerning whether cities are subject to the subchapter described above, in my opinion, if the particular city is an "employer who is required to comply with the drug and alcohol testing provisions under the *Page 6 
Federal Motor Carrier Safety Regulations," and it employs employees who hold commercial drivers' licenses and work in "safety-sensitive" transportation jobs subjected to drug and alcohol testing under federal law, Act 637 of 2007 generally applies to that city. A.C.A. § 27-23-203(a)(1) and (2). Section 27-23-209(e), however, does not subject political subdivisions (including cities), to the penalty provisions of that section.
This conclusion is made clear by A.C.A. § 27-23-203(a)(1) (Supp. 2007), which provides as follows:
 (a) This subchapter applies to:
 (1) An Arkansas employer who is required to comply with the drug and alcohol testing provisions under the Federal Motor Carrier Safety Regulations, as in effect on January 1, 2007. . . .
(Emphasis added).
Federal law requires political subdivisions to comply with the federal regulations on motor carrier drug and alcohol testing (49 C.F.R. § 382.101 through-605). See49 C.F.R. § 382.103(c) (noting that the exception for political subdivisions listed in49 C.F.R. § 390.3(f) does not apply to Part 382). See also, 49 C.F.R. § 382.107. Mandatory exceptions are made for military personnel (49 C.F.R. § 382.103(d)(2)), and a state may exempt certain other persons, including operators of certain farm vehicles (id. at (d)(3)(i)), firefighters and other persons who operate certain commercial motor vehicles necessary for the execution of emergency governmental functions. Id. at (d)(3)(ii).See also, A.C.A. § 27-16-603 (Repl. 2004) (exempting certain military personnel and persons driving certain road and farm vehicles) and A.C.A. § 27-23-119 (Repl. 2004) (authorizing the State Highway Commission to adopt regulations exempting certain classes of drivers permitted by federal law). Otherwise, cities are generally within the parameters of A.C.A. § 27-23-203(a), which makes the subchapter applicable to employers required to comply with drug and alcohol testing under federal law.
Your question is whether the exemption of political subdivisions from the penalty provisions of A.C.A. § 27-23-209, means that political subdivisions are not required to comply with the reporting requirements of the subchapter. In this regard, A.C.A. § 27-23-209 sets out several penalties for noncompliance with the *Page 7 
subchapter (described earlier), but states that "The penalties under this section shall not apply to the State of Arkansas, an agency of the state, or a political subdivision of the state." Id. at (e). In my opinion it is clear that this subsection exempts political subdivisions only from the "penalties under this section" and not from compliance with the entire subchapter. As a consequence, in my opinion cities must implement Act 637, but if they don't, they face no penalties under A.C.A. § 27-23-209. I am unable to comment in the abstract whether there might be other collateral consequences for failure to comply with the Act. Penalties for non-compliance with the federal law may obtain, however. See 49 C.F.R. § 382.507.
Question 2(a) — Does the statute distinguish between employees withfull time, part time, temporary, and/or permanent employmentstatus?
With regard to employees, the applicable subchapter applies to:
 (2) An employee who holds a commercial driver's license and who either:
 (A) Is employed by an Arkansas employer in a safety-sensitive transportation job for which drug and alcohol tests are required under the Federal Motor Carrier Safety Regulations, 49 C.F.R. pts. 350-399, as in effect on January 1, 2007; or
 (B) Has submitted an application for employment with an Arkansas employer for a safety-sensitive transportation job for which drug and alcohol tests are required under the Federal Motor Carrier Safety Regulations, as in effect on January 1, 2007. . . .
A.C.A. § 27-23-203(a)(2) (Emphasis added.)
The subchapter requires an employer to "test an employee for alcohol and drugs if the provisions of this subchapter apply to both the employer and employee under A.C.A. § 27-23-203(a)(1) and (2)." A.C.A. § 27-23-204 (Supp. 2007). Section 27-23-207(a) provides that an "employer shall submit a request for information from the Commercial Driver Alcohol and Drug Testing Database for each employee who is subject to drug and alcohol testing under this subchapter." *Page 8 
The answer to your question concerning full-time versus part-time employees will thus ultimately depend, not upon the state statute, but upon federal law. Officials at the United States Department of Transportation have information available on their website to assist employers. See www.dot.gov/ost/dacp/. Consultation with those officials and/or with the Fayetteville City Attorney is thus advisable on compliance with federal law. I can point you, however, to the provisions of 49 C.F.R. § 382.107, which defines "Driver" as "any person who operates a commercial motor vehicle," which includes, but is not limited to "Full time, regularly employed drivers, casual, intermittent or occasional drivers; leased drivers and independent owner-operator contractors." See also, Belde v. Ferguson Enterprises, 460 F.3d 976
(8th Cir. 2006) (upholding conclusion that "back-up" driver who primarily loaded and unloaded delivery trucks was a "casual, intermittent, or occasional" driver subject to mandatory testing). "Safety-sensitive function" is also defined in the same section as including such things as time waiting to be dispatched, inspecting, servicing or conditioning equipment, operation of commercial motor vehicles, and loading and unloading such vehicles, among other functions. 49 C.F.R. § 382.107. Again, questions as to the applicability of federal law to particular employees should be referred to federal officials, or the counsel to whom the City normally looks for legal advice.
Question 2(b) — Does the statute distinguish between employees whosepositions require a Commercial Driver's license (as opposed to employeeswho happen to merely possess a CDL, regardless of the job duties oftheir position)?
The state subchapter requires the submission of a request for information on each employee who is "subject to drug and alcohol testing under this subchapter." A.C.A. § 27-23-207(a). Again, that question is ultimately controlled by federal law. Consultation with federal officials is likewise advisable on this question. One provision in the applicable state subchapter addresses a related question. In this regard, A.C.A. § 27-23-203(b) states that: "This subchapter does not apply to an individual who is exempt from holding a commercial driver's license notwithstanding whether the individual holds a commercial driver's license."
Question 2(c) — Does the statute apply to employees who are merelyacting as temporary back up in a position otherwise requiring aCDL?
See response to Question 2(a) and 49 C.F.R. § 382.107 (defining "Driver" as "any person who operates a commercial motor vehicle," which includes, but is not *Page 9 
limited to "Full time, regularly employed drivers, casual, intermittent or occasional drivers; leased drivers and independent owner-operator contractors"). See also, Belde v. Ferguson Enterprises, 460 F.3d 976
(8th Cir. 2006).
Question 2(d) — Does the statute apply to employees who are promotedinto a position requiring a CDL?
I assume you are inquiring whether an employer must submit a request for information to the Commercial Driver Alcohol and Drug Testing Database when it promotes an employee into a position for which drug and alcohol testing will be required. In my opinion the answer is "yes." The applicable subchapter requires the submission of a request "for each employee who is subject to drug and alcohol testing. . . ." A.C.A. § 27-23-207(a).
Question 3(a) — This program is administered by the Dept. of Financeand Administration. Many of their services have appellate procedures.What is an employee or prospective employee's appellate procedure ifthey fail a background check and wish to contest it? And what is theemployer's obligation while the employee is appealing?
It is my understanding that the Department of Finance and Administration will be promulgating regulations to implement the provisions of this subchapter. It has not yet done so, however. The current subchapter provides no express procedures in this regard. Questions on this subject should thus be referred to the Arkansas Department of Finance and Administration, Office of Driver Services.
Question 3(b) — The statute encourages people going throughrehabilitation programs in order to mitigate a positive backgroundcheck, but does not specify the timing of said rehabilitation efforts.If a new hire fails a background check, at what point in time must theperson have completed a rehabilitation program? For example, what ifthey failed a drug test two years previously but completed arehabilitation program two weeks before being hired? Similarly, what ifsuch a person offers to complete a rehabilitation program in order to behired or as a condition of employment? At what point is it "too late" touse a rehabilitation program to mitigate a positive drug test orpositive background check?
State law does not address this question. The applicable federal regulations address "substance abuse professionals" and painstakingly set out the applicable *Page 10 
procedures in this regard. See 49 C.F.R. § 40.281 through-313. Again, consultation with the federal officials or the City Attorney is advisable if further information is needed on this issue.
Question 3(c) — What if someone who fails the background checkproduces documentary evidence of having completed an Employee AssistanceProgram (EAP) but it's not in the database?
The applicable subchapter does not address this question. This issue may be one that is ultimately addressed in the implementing state regulations. It is my understanding that the database does not contain information related to EAP or rehabilitation completion and that the responsibility for determining such successful completion lies with the employer. I suggest that questions in this regard be forwarded to the Office of Driver Services.
Question 3(d) — The statute primarily addresses hiring and is unclearabout retaining existing employees (although it states they are to havethe background checks). Do we have to terminate existing employees whofail the background check, may we run them through a substance abuseprogram, and/or may we transfer them to a non-CDL position? If we runthem through a substance abuse program, how is their successfulcompletion of it reported to the database? Is it the medical provider'sresponsibility, our responsibility, or the responsibility of the anotherperson or entity?
The applicable state statutes do not expressly address these issues. Section 27-23-209(b)(1), makes clear that unless an employee has completed a treatment or education program and been found eligible to return to duty, an employer will be penalized for "hir[ing]" an employee with a positive alcohol or drug test in the database. As you note, this statute does not expressly address the retention of an existing employee who fails a database background check. Again, however, federal law is relevant to the actions taken by an employer in this regard. As noted earlier, federal officials or the City Attorney should be consulted on such matters. I can point you in this regard to the provisions of49 C.F.R. § 40.305(b), which provides that:
 (b) As an employer, you must not return an employee to safety-sensitive duties until the employee meets the conditions of paragraph (a) of this section [regarding successful completion of a *Page 11 
treatment or education program and a return to duty test.] However, you are not required to return an employee to safety-sensitive duties because the employee has met these conditions. That is a personnel decision that you have the discretion to make, subject to collective bargaining agreements or other legal requirements.
See also, Burton v. Southwood Door Company, 305 F.Supp.2d 629 (S.D. Miss 2003) stating that:
 Interestingly, the regulations do not require employers "either to provide rehabilitation or to `hold a job open for a driver' who has tested positive, on the basis that such decisions `should be left to management/driver negotiation.'" Eastern Associated Coal Corp. v. UMW, Dist. 17, 531 U.S. 57, 65, 148 L.Ed.2d 354, 121 S. Ct. 462, 468 (2000) (quoting 59 Fed. Reg. 7502 (1994)). In other words, the DOT has established as the "only driving prohibition period for a controlled substances violation," the "completion of rehabilitation requirements and a return-to-duty test with a negative result," id. (quoting 59 Fed. Reg. 7493 (1994)), and there is nothing in the Act or regulations to preclude termination of an employee for a positive drug test.
Id. at n. 2. See also, Belde, supra (in which the Eighth Circuit Court of Appeals was "inclined to agree that [the federal law] did notrequire that [the employer] fire [the employee] rather than reassign him to a non-safety-sensitive position").
With regard to the last part of your question regarding the responsibility for reporting successful completion of an education or treatment program to the database, again, state law does not address this question. Questions in this regard should be forwarded to the Office of Driver Services. See also, however, 49 C.F.R. § 40.331(g), as added June 13, 2008 ("Notwithstanding any other provision of this Part, as an employer of Commercial Motor Vehicle (CMV) drivers holding commercial driving licenses (CDLs) . . . you are authorized to comply with State laws requiring you to provide to State CDL licensing authorities information about all violations of DOT drug and alcohol testing rules (including positive tests and refusals) by any CMV driver holding a CDL"). *Page 12 
 Question 3(e) — What are the standards for a rehabilitation programsufficient to mitigate having failed a drug test? Should it be arehabilitation program with a substance abuse professional of certaincertifications or qualifications? Should we go by whether the programmeets DOT standards?
As stated in response to Question 3(b), federal, rather than state law, addresses this issue. The applicable state law refers to federal regulations addressing "substance abuse professionals," which painstakingly set out the applicable procedures in this regard.See A.C.A. § 27-23-209(b)(2) and 49 C.F.R. § 40.281 through-313. Again, consultation with the federal officials or the City Attorney is advisable if further information is needed on this issue.
Question 3(f) — The Arkansas Civil Rights Act tracks the Americanswith Disabilities Act case law. Given the 8thCircuit Court of Appeals' position in Miners v. Cargill Communications,Inc., 113 F.3d 820 (8th Cir. 1997), what is your opinionon whether the statute in question creates potential legal liability foremployers with regard to "perceived as" cases under the ACRA andADA?
I cannot answer this question in the abstract, without any factual basis upon which to analyze it. See, e.g., Ops. 2006-112 (declining to speculate on a city's liability for unconstitutional acts of a district court judge, due to the "intensely factual" nature of such issues, and suggesting consultation with local counsel); 2006-011 (declining to opine on the potential liability of a county because it would depend upon all the facts and circumstances and advising counties to consult with their local counsel); 99-363 (stating that "[a]n evaluation of potential liability must . . . be made on a case-by-case basis, with consideration given to all of the pertinent facts); 96-163 (stating that "[w]hether the city would be `unduly exposed' to liability is a question properly addressed to local counsel who would be in a position to review all of the individual circumstances); 96-151 (declining to render a definitive opinion concerning the county's potential liability because this would require anticipating the acts or omissions of the county that might be asserted as the basis of any such liability and stating that "[t]his falls outside the ordinary scope of an opinion from this office"); and 92-034 (stating that because this office cannot hypothesize all potential claims of liability in the abstract, reference to the facts of a particular incident must be had to reach a definitive conclusion).
I can state, however, as an initial matter, that there is a clear difference between the Americans with Disabilities Act and the Arkansas Civil Rights Act. As stated *Page 13 
in Faulkner v. Arkansas Children's Hospital, 347 Ark. 941, 69 S.W.3d 393
(2002):
 . . . there is no express provision [in the Arkansas Civil Rights Act] for a cause of action for one who is simply "regarded as" having a disability by others. In this respect, the Arkansas Civil Rights Act differs materially from the federal Americans with Disabilities Act.
 * * * It is true . . . that the Arkansas Civil Rights Act specifically provides that our state courts may look to state and federal decisions which interpret the federal civil rights laws as persuasive authority for interpretive guidance [citing A.C.A. § 16-123-105(c)]. The Arkansas statute, however, does not similarly point to decisions reached interpreting the Americans with Disabilities Act.
Id. at 953-954. The court also distinguished the Eighth Circuit Court of Appeal case Land v. Baptist Medical Center, 164 F.3d 423
(8th Cir. 1999), in which the Eighth Circuit stated that the Arkansas Supreme Court would probably hold the definition of "disability" under the Arkansas Civil Rights Act the same as under the federal Americans with Disabilities Act, because the Land case involved a "presently occurring disability."
I can thus foresee no potential liability under the Arkansas Civil Rights Act for the "perceived a s" cases you describe.
In addition, for purposes of liability under any state causes of action, including the Arkansas Civil Rights Act, A.C.A. § 27-23-211
(Supp. 2007), the last provision in the 2007 "Commercial Driver Alcohol and Drug Testing Act," states that: "The state or any entity required to perform duties under this subchapter shall be immune from civil liability for performing the duties required under this subchapter." To my knowledge, no court has yet had the opportunity to determine whether this provision provides absolute immunity to municipalities under the Arkansas Civil Rights Act. Compare Robinson v. Langdon, 333 Ark. 662,970 S.W.2d 292 (1998) (Arkansas Civil Rights Act did not impliedly repeal A.C.A. § 19-10-305, which provides immunity to state employees for non-malicious acts, stating that "We might have a closer question if state employees were said to be liable for *Page 14 
deprivations of rights under one law and absolutely immune from liability under another . . .") .
Liability under any federal law, such as the Americans with Disabilities Act ("ADA"), would have to be analyzed in light of that law and all the surrounding facts. As with many of the questions you pose, the analysis may include the particular actions taken under the state statutes as well as under the federal statutory scheme (49 U.S.C. § 31306, 49 C.F.R. § 382.101 through-605 and 49 C.F.R. § 40.1
through-413). The affected city should consult its city attorney, or other person to whom it normally looks for legal advice about this issue and its particular applications. 113 F.3d 820 (8th Cir. 1997)), however, I can set out a general discussion of that
Because you reference a particular case (Miners v. CargillCommunications, Inc., 113 F.3d 820 (8th Cir. 1997)), however, I case and the law involved in that decision.
As a general matter, with regard to "perceived a s" cases, the ADA defines "disability" as including "being regarded as having [a physical or mental impairment that substantially limits one or more of the major life activities. . . ."] 42 U.S.C. § 12102(2)(c) (emphasis added). The case of Miners v. Cargill Communications, Inc., 113 F.3d 820
(8th Cir. 1997) sets out the required elements to prove such a claim:
 To establish a prima facie case under the ADA, a plaintiff must show that she was a disabled person within the meaning of the ADA, that she was qualified to perform the essential functions of the job, and that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. [Citation omitted].
 Once a plaintiff has made out her prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). The burden of production then shifts back to the plaintiff to demonstrate that the employer's proffered reason is a pretext for unlawful discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993). After the burden of production has shifted back to *Page 15 
the plaintiff, the evidence produced to show a prima facie case and the "inferences drawn therefrom may be considered by the trier of fact on the issue of whether the [employer's] explanation is pretextual." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 255
n. 10 (1981).
Miners v. Cargill Communications, Inc., 113 F.3d 820 (8th
Cir. 1997) at 823.
Miners involved an employee who sued her employer under the ADA, alleging that she was discharged for her "perceived alcoholism." Plaintiff drove company cars in the course of her employment as promotions director for a radio station. She was discharged, after her supervisor, who was himself enrolled in substance abuse rehabilitation programs, hired a private investigator to confirm her drinking and driving the company van in violation of an "unwritten" company policy prohibiting that conduct. The employer offered the opportunity for her to attend a chemical dependency treatment program due to the "possibility that [she] may be an alcoholic." The employer required that she enter and complete a treatment program or be fired. She at no point admitted to being an alcoholic, rejected the offer and was fired.
She sued, claiming that the employer violated the ADA by firing her because it "regarded" her as an alcoholic. The employer alleged that it fired her because she broke a company rule by drinking before driving a company vehicle, violating the terms of her contract. The employee alleged that the company's explanation was pretext for its discriminatory motivation: its perception that she was an alcoholic. The lower court granted summary judgment for the employer and the employee appealed. The Eighth Circuit held that summary judgment for the employer was improper because the plaintiff presented a prima facie case under the ADA and offered sufficient evidence of pretext to survive summary judgment.
In a decision rendered after the Miners case, the United States Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), explained that "[t]here are two apparent ways in which individuals may fall within the statutory definition of being "regarded a s" disabled: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more life activities." In theMiners case, the Eighth Circuit apparently believed that sufficient evidence had been presented that *Page 16 
the employer "mistakenly believe[d]" that Miner had a physical impairment (alcoholism), that substantially limited her major life activities.
The Miners case, however, did not involve mandatory commercial driver drug and alcohol testing and turned upon its own particular facts. I have found no United States Supreme Court precedent discussing the interaction of the federal law requiring drug and alcohol testing of commercial drivers, and the American with Disabilities Act. Cf.,however, Raytheon Co. v. Hernandez, 540 U.S. 44 (2003) (concluding that a former employee who quit in lieu of being discharged after a positive cocaine test and was denied rehire two years later could not prevail under the ADA where the employer had a neutral no-rehire policy applying to employees discharged for misconduct, as long as sufficient evidence could not be presented that the employer's reason was in fact pretext). Neither have I found any Eighth Circuit case law addressing this precise issue.
Application of the Miners case or relevant U.S. Supreme Court case law to the actions taken under the Arkansas "Commercial Driver and Alcohol Drug Testing Act" would have to be evaluated under the requisite state and federal laws on such testing and all the surrounding facts. Local counsel should be consulted in this regard. The following cases and authorities may be of some interest on the question:42 U.S.C. § 12114(e) (a provision in the ADA, stating that "[n]othing in this subchapter shall be construed to encourage, prohibit, restrict, or authorize the otherwise lawful exercise by entities subject to the jurisdiction of the Department of Transportation of authority to . . . test employees . . . and applicants . . . for the illegal use of drugs and for on-duty impairment by alcohol" and to "remove . . . persons who test positive . . . from safety-sensitive duties . . .");29 C.F.R. § 1630.16(c)(2) (same); Brock v. Lucky Stores, Inc., 23 Fed. Appx. 709,2001 WL 1458014 (9th Cir 2001) (not reported in Federal Reporter) (affirming grant of summary judgment to employer under the ADA where truck driver, who tested positive for cocaine and was initially terminated and then allowed to return to work under a "return to work agreement," later violated that agreement by missing a required drug addiction recovery meeting); Parry v. Mohawk Motors of Michigan,Inc., 236 F.3d 299 (6th Cir. 2000) (affirming grant of summary judgment to employer of truck driver who alleged under the ADA that he was administered a random drug test because his employer "perceived" him to be a drug user, because the driver failed to produce any evidence that his employer believed he was illegally using drugs to the extent that one or more of his major life activities were substantially limited); Redding v. Chicago Transit Authority, 11 A.D. Cases 157, *Page 17 
19 NDLR P 74, 2000 WL 1468322 (N.D. Ill. 2000) (not reported in F.Supp.2d) (granting transit authority's motion for summary judgment on bus operator's ADA claim because an employee who fails a drug test and does not successfully complete treatment is not a "qualified individual" for purposes of making a prima facie ADA claim, stating that "[e]ven if Plaintiff's status as a recovering drug addict is viewed as a protected disability status, the employer is unquestionably entitled to take action on the basis of her use of drugs or failure to complete a drug abuse program"); Schmidt v. Safeway Inc., 864 F.Supp. 991 (D. Or. 1994) (holding that a genuine issue of material fact remained as to whether an employer discharged a truck driver in accordance with company policy regarding use of alcohol by drivers that was consistently applied to similarly situated employees in a non-discriminatory manner and if so, defendant was not liable under the ADA); and (David L. Laporte, TheConflict and Interaction of the Americans with Disabilities Act with theOmnibus Transportation Employee Testing Act: Two Modest Proposals toAchieve Greater Synchrony, 45 DePaul L.Rev. 537 (Winter 1996).
Deputy Attorney General Elana C. Wills prepared the foregoing opinion, which I hereby approve.
Sincerely,
 DUSTIN McDANIEL Attorney General
[1] The applicable federal law is found at 49 U.S.C. § 31306,49 C.F.R. Part 40, §§ 40.1 through-413, and 49 C.F.R. Part 382, §§ 382.101 through-605. The first-cited provision is a part of the "Federal Omnibus Transportation Employee Testing Act of 1991" or "FOTETA."