SLIP OPINION

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-13-1072

|  |  |
|---|---|
| ROBERT FUREIGH<br>APPELLANT | **Opinion Delivered** April 16, 2014 |
| V. | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, SECOND DIVISION<br>[NO. 60-CV-10-4178-2] |
| MICHAEL G. HORN AND W.M. HOGAN<br>APPELLEES | HONORABLE CHRISTOPHER CHARLES PIAZZA, JUDGE |
|  | AFFIRMED |

## RITA W. GRUBER, Judge

This case is before us for the second time. On May 17, 2012, the circuit court granted summary judgment to Michael G. Horn and W.M. Hogan (now appellees) and dismissed the complaint of Robert Fureigh (appellant) for claims of defamation, tortious interference with a contractual relationship, and the tort of outrage. We dismissed the first appeal in *Fureigh v. Horn*, 2013 Ark. App. 287, finding that the order lacked finality because appellees' defamation complaint against a third party was pending when appellant filed his notice of appeal. *Id.*[1] The circuit court now has dismissed appellees' third-party complaint with prejudice, and

---

[1] We noted that when the circuit court entered an order dismissing the third-party complaint, it had no jurisdiction to do so because the record had been lodged with our court on appeal.

We also acknowledged that our savings statute allowed appellees a year to refile their defamation counterclaim against appellant, apparently a compulsory counterclaim, after they took a voluntary nonsuit in November 2011. *Id.* More than two years has now passed, and there is no indication that the counterclaim was refiled.

SLIP OPINION

appellant has timely filed his second notice of appeal from the order of summary judgment. He contends that the circuit court erred in dismissing his causes of action and granting summary judgment to appellees on his claims for defamation and tortious interference with a contractual relationship.[2] We affirm.

Summary judgment is appropriate only when it is clear that there are no genuine issues of material fact to be litigated. *Locke v. Cont'l Cas. Co.*, 2013 Ark. App. 690. Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate existence of a material issue of fact. *Id.* We focus our review not only on the pleadings but also on the affidavits and documents filed, viewing the evidence in the light most favorable to the party against whom the motion was filed and resolving all doubts and inferences against the moving party. *Id.* If a respondent cannot meet proof with proof on an essential element of his claim, the movant is entitled to judgment as a matter of law. *Lee v. Martin*, 74 Ark. App. 193, 45 S.W.3d 860 (2001).

Here, the following facts are largely undisputed. The LPA Group, Inc., an engineering consulting group, hired appellant as an airport engineer and consultant in March 2005 to assist with servicing Arkansas clientele. After the company failed to obtain a contract for work at the North Little Rock Municipal Airport, appellant began requesting information about aircraft based there to learn if they were registered in Arkansas and were paying state and local taxes. Using LPA's telephone and email systems, he made FOIA requests to the airport

---

[2]Appellant does not appeal the grant of summary judgment on his claim for the tort of outrage.

SLIP OPINION

manager, the city attorney, and finally the FAA for a document listing the tail numbers of those aircraft. Appellant provided registration information he received from the FAA to Pulaski County Tax Assessor Janet Troutman Ward, and her office investigated whether taxes had been paid. Appellant went to her office several times, meeting with her twice.

On August 14, 2009, appellant's immediate supervisor, Mike Stengel, emailed LPA's senior vice president, Paul Holt of South Carolina, that the two of them should talk. Mr. Holt then became aware through Mr. Stengel of appellant's inquiries. On August 17 and 28, 2009, respectively, appellees Horn and Hogan each wrote to LPA's president and CEO, Arthur Parrish, detailing their frustration with LPA over appellant's efforts to obtain tail numbers and tax information. On September 9, 2009, LPA terminated appellant's employment for violation of company policies: conflict of interest, inappropriate use of company communication tools, and inappropriate behavior regarding company business.

Appellant filed his complaint against appellees on July 21, 2010. In the first appeal, we summarized the allegations of the complaint:

> [Appellant] contended that sometime before August 2009, he had inquired why "certain airplane owners were not paying taxes to the Pulaski County Tax Collector and the State of Arkansas." He also had asked for tail numbers of all planes based at the North Little Rock Airport. . . . Appellant then alleged that appellees campaigned to have him fired from his job, and he attached an August 2010 letter from each appellee to the president and CEO of The LPA Group, in which appellees claimed that appellant was working with the Pulaski County Tax Assessor to assess potentially unfair and burdensome taxes on their airplanes. Appellees expressed outrage in the letters and suggested that appellant's actions might have been retribution for or a vendetta against the pilots because The LPA Group's bid was not awarded a contract to supply engineering services to the North Little Rock Airport. Appellant claimed that appellees' actions interfered with a valid contractual relationship between him and his employer and that the statements were false, improper, and made with malice and in reckless disregard of the consequences.

3

*Fureigh*, 2013 Ark. App. 287, at 1–2. Appellees timely answered, raising the affirmative defenses of waiver, estoppel, and statute of limitations and asserting the truth of anything they may have said or written as an affirmative defense to his defamation claim. They affirmatively pleaded that appellant had not been a licensed engineer in Arkansas since sometime in 2000, and they denied his entitlement to punitive damages.

After discovery was complete, appellees filed motions for summary judgment and supporting depositions, affidavits, and other materials. They alleged that statements in their letters could not support appellant's defamation claim because they were true statements of fact and opinion; that even if the letters were defamatory, appellees had a qualified privilege to write them; that their conduct was not improper, as required for proof of intentional interference with a contractual relationship; that the facts did not support a claim of outrage; and that appellant could not prove damages. Appellant responded, attaching supporting documents and materials and arguing that there remained material facts in dispute to be resolved by a jury. After conducting a hearing, the circuit court granted appellees' motion for summary judgment.

I. *Whether the Circuit Court Erred in Granting Summary Judgment to Appellees and Dismissing Appellant's Cause of Action on His Claim for Defamation*

The following elements must be proved to support a claim of defamation: the defamatory nature of the statement of fact, the statement's identification of or reference to the plaintiff, publication of the statement by the defendant, the defendant's fault in the publication, the statement's falsity, and damages. *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 69 S.W.3d 393 (2002). Additionally, the allegedly defamatory statement must imply an

4

assertion of an objective verifiable fact. *Id.* A viable action for defamation turns on whether the communication or publication tends to or is reasonably calculated to cause harm to another's reputation. *Id.* The plaintiff must establish actual damage to his reputation—although the harm may be slight—and prove that the defamatory statements were communicated to others and detrimentally affected those relations. *Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002). *See also* AMI Civ. 411 (2014) (defining defamation as a statement of fact that is false and actually causes harm to a person's reputation); *Brown v. Tucker*, 330 Ark. 435, 954 S.W.2d 262 (1997) (affirming the dismissal of a claim for slander where words possessed the tenor of an opinion).

Appellant contends that material issues of fact remain as to whether (A) statements made by appellees in their letters were false, and thus were defamatory; (B) appellant was damaged by the statements; and (C) appellees' qualified-privilege claims have viability as affirmative defenses. Appellees respond that there are no genuine issues of material fact because (A) their letters consisted of true statements of fact and the writers' opinions; (B) their letters were not the proximate cause of appellant's termination; and (C) their statements were privileged, as appellees were protecting their own interests.

Appellee Horn's letter to Mr. Parrish was written on August 17, 2009. The text is as follows:

> It is with great concern I write you today. *I represent a group of pilots in the central Arkansas area* and we are quite concerned and confused. The LPA Group has been promoted to us as a company that desired to assist the airports of Arkansas meet the needs of their facilities as they work with the pilots and aircraft owners and operators of the aircraft that utilize the central Arkansas airports. Why then has The LPA Group taken such diametrically opposed steps against the best interests of general aviation in



this area?

*Recently, we became aware of your [company's] efforts, through your representative, Robert Fureigh, to work with the Pulaski County Tax Collector to assess some potentially unjust and certainly burdensome taxes on the aircraft that patronize the central Arkansas airports, especially the North Little Rock Municipal Airport.* The only logical explanation is that this is some attempt to help the state of Arkansas garner unjustified revenue from the many aircraft engaged in interstate commerce and owned in states other than Arkansas, similar to the efforts made public recently in Maine and Florida. This unjust taxation of aircraft in states they may visit in the course of normal commerce along with the taxes these owners and operators have already been assessed and paid in their home states is intolerable and can not be tolerated, nor those who propose such a fundamentally unfair act.

My immediate reaction would be to contact the AOPA and EAA along with every pilot organization, airport manager and airport commission in the country to publicize your actions. *I've always heard there is no such thing as "Bad Publicity" and I am tempted to make every effort to see to it that you [receive] every bit of publicity that your [company's] deplorable acts deserve.* In all fairness though, I wanted to give you an opportunity to respond to the public statements made by your representative, Robert Fureigh, as well as the numerous LPA Corporate emails he has sent to the FAA, airport managers and others concerning this matter.

I would have hoped the good will and continued amiable business relationship between your company and general aviation airports throughout the United States would have been . . . more important to your company than whatever you may gain from working with the Pulaski County Tax Assessor and Collectors offices. *It has also been suggested that this action began as retribution for not having been chosen for a recent contract for services at the North Little Rock Airport.* Neither explanation reflects well upon your business. This certainly seems to be an ill advised change to your overall business plan.

I anxiously await your response.

(Emphasis added.)

Appellee Hogan's letter to Mr. Parrish was written after Mr. Horn's letter had been written. Dated August 28, 2009, it states:

I am writing you as I know others have about the conduct of one of your representatives Mr. Robert Fureigh.


As you know LPA was competing for a contract for the supply of engineering services for the North Little Rock, AR Airport. In what I believe was a free and fair competition the contract was awarded to another group. In business we win some and we lose some.

What transpired after was in a word "unbelievable." *Your employee under the banner of the LPA Group began a vendetta against the pilots of the North Little Rock Airport by accusing them of not paying taxes and enlisting the state authorities to investigate all.* As most that I know are good taxpaying citizens this really amounts to either just harassment or an attempt at coercion to get the airport and its patrons to reconsider the contract award. As you further know tax liability of aircraft is very complicated with domicile issues, transit issues, etc. We pilots, who are subject to such harassment due to actions of your firm, will certainly expect reimbursement for the considerable expenses involved in defending our positions. Attorneys and accountants will of course be required in liberal measure.

*Rather than spend time on such activities the pilots here would like your firm to complete the improvement work on another airport in the region (7M3). Mr. Fureigh managed the improvement some one year ago* which included runway widening and airport lighting replacement and improvement. The approach lighting has never worked. The lessee/manager has reported this several times with no corrective action. All of us who fly there consider the lack of a viable operation approach lighting system to be critical to flight safety. I am amazed there has not been a fatal accident there as the airport is in a mountainous and obstacle rich area. Letting down there at night is dangerous; especially so without the VASI.

. . . .

*I hope you can attend to and undo the damage done to the good pilots of NLR* and take the fastest possible action to rectify the unsafe situation at 7M3. I look forward to your prompt response on these matters.

(Emphasis added.)

A. Whether Questions of Material Facts Remain Concerning Statements Made by Appellees in Their Letters

Appellant asserts that particular statements in appellees' letters were defamatory statements of fact. He points to appellee Horn's statements that he represents a group of pilots and that appellant wanted Arkansas to assess unjust taxes; Horn's threat of bad publicity for



LPA; Horn's accusation that appellant's conduct was deplorable; and Horn's accusation that appellant acted against plane owners as retribution for LPA's not being awarded the contract. He points to appellee Hogan's characterization of appellant's actions as a vendetta; Hogan's "hearsay" statement that appellant had accused pilots of not paying their taxes; Hogan's accusation that appellant shirked his responsibilities at the Mt. Ida airport; and Hogan's request that LPA undo damage. From our review of the pleadings, affidavits, and documents in this case, the evidence viewed in the light most favorable to appellant is as follows.

Mr. Horn stated in his deposition that he was a licensed aircraft dealer; that he had an interest in several corporations, some of which had owned planes that he bartered and sold; and that some planes he had on consignment were registered in states other than Arkansas. He testified that he did not know appellant and wrote Mr. Parrish because

> we had a group of people that had been together discussing the horrible things that had been going on at the airport and the falsehoods that we felt like were being spread about us. The LPA group was taking this as a vendetta against the North Little Rock Airport for losing the engineering contract. . . . The horrible things that he was doing were, as I said, the accusations of criminal conspiracies and failure to pay taxes and just a continuing barrage of things that muddied the waters about the airport and the people that hang out at the airport. In our opinion the accusations were unjustified.

He explained that this group of pilots decided someone should write LPA and that he ended up "being the lucky one." He testified that people at the airport told him about appellant's FOIA requests; that appellant's accusations began after LPA failed to receive the airport contract; and that, in his opinion,

> Mr. Fureigh was being directed by LPA to take on the users and the North Little Rock Airport and accusing various airport patrons of tax fraud, conspiracy to commit some criminal acts, and a flurry of emails to the airport commission about end [sic] numbers and aircraft and various things.

Mr. Horn testified that he was concerned that transient aircraft would not stop in Arkansas if subject to an "unjust and burdensome tax," that he had been falsely accused of not paying taxes or assessing, and that he had undergone an investigation and an audit.

Appellee Hogan testified by deposition that he had an interest in corporations that owned three airplanes, that the sole plane based in Arkansas was assessed in Arkansas, and that he paid local and state taxes on it. He testified that he, like appellee Horn, had been audited based upon untrue allegations and had been found to have no tax liability. He said that he had never heard of appellant before seeing him at airport commission meetings and council meetings. He testified that he learned in group conversation of appellant's accusations about patrons of the North Little Rock Airport not paying taxes, that Janet Ward told him appellant had accused him, and that he (Hogan) viewed appellant's complaints as retribution for LPA's failure to get the contract at North Little Rock. He said that as a pilot who flew in and out of the Mt. Ida Airport, where LPA did get the contract, he knew that the approach lights there did not work; and that the airport manager there had told him appellant had been in charge of the improvements.

Charles "Skipper" Polk, North Little Rock Airport's director, stated by affidavit that after LPA was not chosen for the contract, appellant asked him in emails and conversation about tail numbers; appellant told him that pilots, specifically appellees, evaded paying taxes on their aircraft; and appellant accused him of assisting pilots to do so. Janet Ward stated in her affidavit that appellant alleged that pilots at the airport were evading taxes on their aircraft and that she informed him, after investigating the matter, that the aircraft were properly

assessed.

In a letter of September 15, 2009, Paul Holt responded to appellee Hogan. Mr. Holt wrote that LPA, upon learning of appellant's efforts to obtain tax information on the aircraft, immediately ordered him to stop; that, contrary to the perception created through appellant's use of LPA phone and email systems, his actions were neither part of LPA's mission nor intended as retribution for its failure to win the contract; that Mike Stengel—not appellant—had managed the Mt. Ida project; that LPA was working to help Mt. Ida obtain a grant to fix the lighting; and, finally, that appellant was no longer employed by LPA.

In his deposition testimony, appellant recounted his efforts to ascertain whether aircraft based at the North Little Rock Airport were registered in Arkansas and paying appropriate taxes. He stated that he had not been involved in LPA's attempts to get the engineering contract there and that during his time with LPA, he did have some secondary responsibility over the airport at Mt. Ida. In his personal appraisal at LPA, he wrote that his significant contributions included "[p]roject formulation efforts to guide Mt. Ida in transitioning from the MP phase into a development program with their available NPE entitlements (apron, rwy widening, land acq, possibly CC self fueling system)."

We agree with appellees that no material questions of fact remain on appellant's claim for defamation. Appellee Horn testified that he represented a group of pilots at the North Little Rock Airport and that he considered the taxes he had been accused of evading to be unjust. Both Skipper Polk and Janet Ward stated that appellant accused pilots of evading taxes on aircraft based at the airport, and Ms. Ward stated that she informed him that aircraft based

there had been properly assessed. Mr. Horn's threat of bad publicity, made to LPA rather than to Fureigh, was not defamatory in itself, and his characterization of appellant's actions as "deplorable" was merely an opinion. Mr. Horn stated in his letter that it had been "suggested" that appellant's actions were retribution for not receiving a contract, and he testified that this was also his opinion due to the timing of the accusation.

Likewise, appellee Hogan's characterization of appellant's actions as a vendetta is Hogan's opinion or interpretation of those actions rather than a statement of fact. As for his use of a hearsay statement that appellant accused pilots of evading taxes, its truth was evidenced by Janet Ward's and Skipper Polk's affidavits and by appellant's complaint itself. Mr. Hogan stated that appellant had managed past improvement work at Mt. Ida and that problems with the approach lighting had not been corrected. Although appellant admitted to some responsibility at the airport and wrote that he contributed to project formulation efforts there, Mr. Holt told Mr. Hogan that someone other than appellant managed the improvement and that LPA was helping the airport obtain a grant to correct the problem. Thus, LPA could not have understood Hogan's statement in a defamatory sense. Finally, Hogan's expression of hope that LPA would undo damage to the North Little Rock pilots was a request, not a statement of fact to serve as a basis for defamation.

In sum, appellees' letters consisted of true statements of fact and the writers' opinions. They contained no defamatory statements of fact, and summary judgment was properly granted on appellant's cause of action for defamation.

B. Whether Genuine Issues of Material Fact Remain because Appellant was Damaged by Statements in Appellees' Letters

11

Appellant submits that there was sufficient proof of damages to submit the question to the jury. He points to his testimony that LPA fired him at age sixty-one, when he was making almost $86,000 a year; that he was in good standing with LPA and had been told that he had years left with the company; that, in his opinion, he had ten years left; but that appellees' letters rendered him "radioactive," or unemployable in his field in Arkansas.

We agree with appellees that statements in their letters did not proximately cause appellant's termination. Mr. Holt, who fired appellant, testified that the emails alerted LPA to his inappropriate activity and triggered consideration of his termination: "What turned the corner for his eventual termination was finding out more about what he was doing. I found out more by talking to [appellant] and Mike Stengel and that's it. Then we received the letters after that."[3] Thus, the undisputable material facts demonstrate that the letters did not proximately cause appellant's termination, and summary judgment was proper.

C. Whether Genuine Issues of Material Fact Remain Regarding Appellees' Privilege to Make Statements

Appellant asserts that there remains the question of whether appellees had a qualified privilege to make defamatory statements to LPA. He proposes that there can be no privilege claim about failure to pay "taxes due but . . . being avoided" or about possible crime, and that the safety issues at Mt. Ida had nothing to do with appellant.

A qualified or conditional privilege may arise when a common interest is involved and

---

[3]Mr. Holt also testified that appellant had been reprimanded sometime before his termination when he "took it upon himself to go out and lobby" small-airport clients against large-airport clients in an effort to fund projects; Mr. Holt told him that this was a conflict of interest and that he needed to cease, and appellant did.

SLIP OPINION

the communication is reasonably calculated to protect or further the common interest of the publisher and recipient. *Navorro-Monzo v. Hughes*, 297 Ark. 444, 763 S.W.2d 635 (1989). If the utterances go outside the bounds of reason and purpose for making the statements, the immunity can be lost. *Id.* (citing *Dillard Dep't Stores, Inc. v. Felton*, 276 Ark. 304, 634 S.W.2d 135 (1982)). Such communication must be "made in good faith upon any subject–matter in which the party communicating has an interest, or in reference to which he has a duty, either legal, moral, or social, if made to a person having a corresponding interest or duty." *Ikani v. Bennett*, 284 Ark. 409, 411, 682 S.W.2d 747, 748–49 (1985) (quoting *Merkel v. Carter Carburetor Corp.*, 175 F.2d 323 (8th Cir. 1949)).

Even if statements in appellees' letters were defamatory, we would find that summary judgment was proper. The letters were written only to LPA, the entity that appellees reasonably believed to be responsible for appellant's actions, and with whom they had a common interest. The plain language of Mr. Horn's letter reveals that his purpose was to protect his reputation, financial interest, and pilots at the North Little Rock airport. Mr. Hogan likewise wrote to protect his reputation and financial interest, as well as the safety of pilots flying into the Mt. Ida Airport.

## II. *Intentional Interference with a Contractual Relationship*

The tortious interference with business expectancy requires proof of the following elements: existence of a valid contractual relationship or a business expectancy; knowledge of the relationship or expectancy on the part of the interfering party; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant

13

damage to the party whose relationship or expectancy has been disrupted. *Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 363 Ark. 530, 540, 215 S.W.3d 596, 601 (2005). Additionally, for an interference to be actionable, it must be shown to be improper. *Id.*

Appellant alleged in his complaint that he had a valid contractual relationship and business expectancy with LPA, of which appellees had knowledge; that appellees' intentional interference with the contract and business expectancy caused termination of his employment; and that their actions were improper. He relies on *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543 (1969), where our supreme court reversed the grant of summary judgment on Fred Mason's claim for wrongful interference with his employment contract in favor of four appellees: Dean Hudson, school superintendent; Neill Hudson and Jack Connor, school principals; and John Kron, school board member. Mason was employed by Field Enterprises in 1963 to sell encyclopedias, dictionaries, and other publications; was elected to the Calico Rock School Board in 1966; and was fired from employment in August 1967 by the company's state manager, Funderburk, who began receiving derogatory communications about Mason from the four men in November 1966. The first was a letter from Superintendent Hudson, in which he

> stated his assumption that it was against company policy for Field's sales personnel to be members of local school boards, and transmitted a report that Mason had promised to see that the superintendent, principal and some of the teachers at Calico Rock were fired and had intimated that some of the school board members there had profited financially from a building program. He stated his belief in the truth of the reports, his opinion that Mason's actions were highly unethical, his desire to buy materials so that Mason would receive no commission and his request to other school administrators not to buy from Mason or sales people under his control.

*Mason*, 247 Ark. at 531, 446 S.W.2d at 549.



Next, Principal Neill Hudson wrote a letter expressing his opinion that Funderburk would want to put a stop to the confusion and ill feeling Mason was causing; that Neill had heard his brother Dean express doubt that, should the situation continue, the school's new library would have the World Book Encyclopedias that appellant was selling; and that "Mason is strictly a politician in the lowest sense of the word." *Id.* at 531–32, 446 S.W.2d at 549. After Neill Hudson wrote a second letter, requesting a reply, Funderburk called Dean Hudson at his office to discuss the controversy. Subsequently,

> Dean Hudson called Funderburk by telephone advising that Mason and others had filed a suit against the superintendent of schools at Calico Rock. This conversation lasted about an hour. Funderburk also received a letter dated July 20 from John Kron in which Kron suggested that Mason be called off or discharged, accusing Mason of maliciously injuring the school system and of saying to a business man that, if he thought things were fouled up, give him (Mason) another year. Connor, the high school principal, also wrote Funderburk on July 20. He accused Mason of harassing the superintendent and of trying to get the superintendent and the board to do things that were illegal.
>
> The filing of the suit by Mason had been brought to Funderburk's attention by his office manager before Dean Hudson's telephone call. Funderburk also received newspaper clippings through the mail and coverage given the filing of this suit in newspapers in Izard County and Little Rock also came to his attention. On July 25, 1967, Funderburk asked Mason to resign from his position with the company, and, when Mason refused to do so, gave him written notice of termination of the contract of employment. *In his affidavit Funderburk stated that his decision to terminate Mason's employment was prompted by a controversy in which Mason had become involved with some member of the Calico Rock School Board, of which he first became aware by the letter from Dean Hudson dated November 7, 1966.*

*Id.* at 532, 446 S.W.2d at 549–50 (emphasis added). Our supreme court found that language in these letters could be the basis of a jury question as to the right to recovery for defamation, and that the four appellees had not shown, as a matter of law, that their actions did not constitute an unlawful interference, an actionable civil conspiracy, or actionable defamation.

15

The facts of the present case are easily distinguishable from *Mason*. Appellees Horn and Hogan wrote single letters to appellant's employer with the motive that LPA cease actions the writer believed to be detrimental to his own reputational and financial interests or to pilots in general. Horn and Hogan did not know appellant previously, had no business competition with him, and did not request termination of his employment.

As for appellant's business expectancy with LPA, he represented himself as a licensed engineer when applying for employment with LPA although his Arkansas license had lapsed. As admitted by his signature on his application, he was aware that misrepresentations were grounds for termination. Moreover, he testified that he had sought VA disability for Vietnam-related PTSD since before his termination by LPA, that he currently was receiving disability benefits, that he believed his PTSD was unchanged for the last five to ten years, and that his VA doctor opined that appellant "[had] little or no employment because of the PTSD."

Finally, appellees pleaded in their answer to appellant's complaint the affirmative defense of estoppel. The doctrine of inconsistent positions is a form of estoppel that prevents an individual from asserting claims that are inconsistent from the individual's previous positions. *Dupwe v. Wallace*, 355 Ark. 521, 140 S.W.3d 464 (2004). In the present case, appellant testified that all his damages resulted from his termination from LPA. A year earlier, however, he stated at a hearing before the Engineering Board:

> A few weeks ago I received a letter from the VA that found me to be 100 percent disabled, and a part of that determination is they find me to be unemployable.

. . . I will be financially secure because of my 100 percent Vietnam combat-related PTSD. . . . I will not be practicing engineering anymore. If I have any employment, I will lose my VA unemployment income for the rest of my life. I will be okay with that disability, there is an extra factor because it's combat related it gets doubled. So I'm fine financially and it makes no sense for me to do any kind of work.

These statements demonstrate that appellant had no damages or business expectancies, both necessary to his causes of action. Furthermore, because his statements are inconsistent with regard to his claims in this case, he is now estopped from asserting damages at all. Appellees are entitled to judgment as a matter of law.

### III. *Conclusion*

The undisputable material facts show that summary judgment was proper in favor of appellees on appellant's causes of action for defamation and intentional interference with a contractual relationship. His termination was not proximately caused by appellees' actions, their letters did not contain defamatory statements of fact and were not improper, the letters were privileged statements, and appellant had no business expectancy. We affirm the judgment of the circuit court in all respects.

Affirmed.

WHITEAKER and VAUGHT, JJ., agree.

*Ogles Law Firm, P.A.*, by: *John Ogles*, for appellant.

*Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C.*, by: *Stuart P. Miller* and *Holly M. Lar*, for appellee W.M. Hogan.

*Hankins Law Firm, P.A.*, by: *Stuart W. Hankins* and *A. Vaughan Hankins*, for appellee Michael G. Horn.